UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RICHARD EARLE SHERE, JR.,

       Petitioner,

v.                                  Case No.  8:00-cv-1996-T-23TGW

SECRETARY, DEPARTMENT OF
CORRECTIONS,

       Respondent.

_____/

## O R D E R

     Richard Earle Shere, Jr., a Florida prisoner under sentence of death, petitions for

the writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Shere proceeds on his timely-

filed amended petition (Doc. 50) (the "petition").  Because Shere was tried and

sentenced in Hernando County, Florida, venue properly lies in the Middle District of

Florida.

### FACTUAL BACKGROUND

     The Florida Supreme Court states the pertinent facts in Shere v. State, 579 So.

2d 86 (Fla. 1991):

        The victim, Drew Snyder, was reported missing in December 1987,
and the ensuing investigation led to Shere, whom police contacted three
weeks after Snyder's disappearance.  Shere waived his Miranda [FN2]
rights, made a series of statements, and led detectives to various scenes
involved in the murder.[FN3]

        [FN2].  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16
L.Ed.2d 694 (1966).

> [FN3].  One of the statements was recorded, and that
> recording was played to the jury.  Detective Alan Arick related
> to the jury the contents of Shere's other statements.

According to those statements, Shere said Bruce "Brewster" Demo told him on December 24 that Snyder was going to inform the police about Demo's and Snyder's theft of some air conditioners.  Demo also advised Shere that Snyder was a "big mouth" who "had ratted out" on Shere as well.  Shortly after midnight on the morning of December 25, Shere received a telephone call from Demo advising him that Demo was thinking about killing Snyder, and Demo threatened to kill Shere if he did not help.  Shere then went to Demo's house where Demo loaded a shovel into Shere's car.  They smoked marijuana, drank beer, went to Snyder's house at about 2:30-3:00 a.m., and talked Snyder into going rabbit hunting.

At some point during the hunt in the early morning hours, Shere placed his .22-caliber pump action rifle on the roof of the car so he could relieve himself.  Suddenly, Shere said, Demo grabbed the rifle, and Shere heard the weapon discharge.  Shere dropped to the ground and heard Snyder say, "Oh, my God, Brewster," followed by several more shots.  When the shooting stopped, Shere got up and saw Snyder, still breathing, lying on the back seat of the car.  Shere said he wanted to take Snyder to the hospital, but Demo took out his own gun, a .22-caliber pistol, and shot Snyder in the forehead, pulled him out of the car, and shot Snyder again in the chest.  After the last shot was fired, they loaded Snyder's body into the trunk and drove to a nearby location where Shere said Demo made him dig a hole and bury the body.  Then Shere took Demo home, drove to his own house, cleaned up, and burned the bloodied back seat of his car in the back yard.

At Demo's suggestion, Shere said, he and his girlfriend, Heidi Greulich, [FN4] went to Snyder's house later that day, gathered some of Snyder's belongings, then drove to Clearwater to dump the belongings, hoping to leave the impression that Snyder had suddenly left town.  Shere also said he traded the .22-caliber rifle after the murder.  Detectives recovered the rifle and Shere identified it as one of the weapons used to shoot Snyder.

> [FN4].  Heidi Greulich said that subsequent to the murder, she
> and Shere married, and she testified under the name Heidi
> Greulich Shere.

Contradicting Shere's account, Demo made a statement to detectives in which he accused Shere of firing the first shots.  Detective Alan Arick

testified in the defendant's case without objection that Demo said he turned his back to the car to relieve himself when he heard a shot. He turned and saw Shere pointing the rifle at Snyder, then Shere fired at Snyder five or six times through the car's window. Demo said Shere pointed the gun at him and told him to finish off Snyder, Arick testified. Demo said he fired the pistol two times into Snyder's head and one time to the heart, including "the fatal shot." Demo told Arick he made Shere dig the grave because he was upset by what Shere had done to Snyder.

Greulich testified as a court witness about a statement she made to detectives in January 1988. In her statement she told detectives that she overheard Shere's end of the telephone conversation with Demo in the early hours of December 25. Shere reportedly said to Demo "I can't believe Drew would turn state's evidence against me." When Shere returned home on the morning of December 25, Greulich told detectives, she saw blood on Shere's jeans and on the back seat of Shere's car. Greulich testified that Shere told her he alone killed Snyder, but he said that only to protect her, because "[i]f I knew Brewster was out there, Brewster would have hurt me."

Shere's friend, Ray Pruden, testified that one night after Christmas Shere told him he shot Snyder to death while out rabbit hunting. He said he shot him ten or fifteen times, then buried the body. Shere did not say that Demo was involved, Pruden testified.

Medical testimony established that Snyder was shot to death with ten gunshots. Three shots were fired into his head, one shot was fired through the chest, and other shots were fired into the back, the buttocks, the right thigh, and the right forearm. Death could have been caused by gunshot wounds to the head or chest. The medical examiner testified that any of the shots could have caused pain had Snyder been conscious, but there was no evidence that Snyder was conscious.

Seven projectiles were removed from the body during the autopsy. Ballistics evidence showed that shots fired into Snyder's head came from the pistol, one bullet recovered from Snyder's leg was fired from the rifle, and others could not be clearly identified. Other forensic evidence established that shots had been fired in Shere's car, that human blood was found on Shere's boots, and that a hair from Snyder was found on Shere's jacket.

The jury found Shere guilty and recommended the sentence of death by a vote of seven to five. In its written findings to support the death sentence, the trial court found three aggravating circumstances: 1) the murder was committed to disrupt or hinder the lawful exercise of a

governmental function or the enforcement of laws by eliminating a witness;
[FN5] 2) the murder was especially evil, wicked, atrocious, or cruel;
[FN6] and 3) the murder was committed in a cold, calculated, and
premeditated manner without any pretense of moral or legal justification.
[FN7] In mitigation, the court wrote that it considered numerous possible
mitigating circumstances, rejected some, and found that "the aggravating
circumstances far outweighed the mitigating circumstances."

[FN5]. See § 921.141(5)(g), Fla.Stat. (1987).

[FN6]. See id. § 921.141(5)(h).

[FN7]. See id. § 921.141(5)(i).

Shere v. State, 579 So. 2d at 88-89.

## STANDARD OF REVIEW

Shere alleges nineteen separate grounds for relief.  Because Shere filed his

petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by

the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  Penry v. Johnson,

532 U.S. 782, 792 (2001); Henderson v. Campbell, 353 F.3d 880, 889-90 (11th Cir.

2003); Maharaj v. Sec'y Dept. of Corrections, 304 F.3d 1345, 1346 (11th Cir. 2002).

The ultimate issue with respect to each claim is whether the Florida Supreme Court's

resolution of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of clearly established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Price v. Vincent, 123 S.Ct. 1848, 1852-53 (2003); Williams v.

Taylor, 529 U.S. 362 (2000); Clark v. Crosby, 335 F.3d 1303, 1308 (11th Cir. 2003);

Robinson v. Moore, 300 F.3d 1320 (11th Cir. 2002); Van Poyck v. Florida Department of

Corrections, 290 F.3d 1318 (11th Cir. 2002); Harrell v. Butterworth, 251 F.3d 926, 930 (11th Cir. 2001).  Shere must show not merely that the state courts "got it wrong," but that the result is objectively unreasonable.  Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams v. Taylor, supra).  If no Supreme Court precedent controls or if applicable precedent is ambiguous, no "clearly established" precedent contravenes the state court's conclusion.  Mitchell v. Esparza, 540 U.S. 12, 16 (2003); Clark v. Crosby, 335 F.3d 1303, 1308-10 (11th Cir. 2003); Washington v. Crosby, 324 F.3d 1263, 1265 (11th Cir. 2003).

A factual finding by a state court is presumed correct, and the petitioner must rebut the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Henderson, 353 F.3d at 890-91.  The statutory presumption of correctness applies only to the state court's finding of fact and not to a mixed determination of law and fact.  Parker v. Head, 244 F.3d 831, 836 (11th Cir. 2001).

Procedural Default

Only two narrow circumstances excuse a procedural default.  First, the petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both cause for the default and actual prejudice resulting from the default.  Cause ordinarily requires a petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court.  Henderson v. Campbell, 353 F.3d at 892; Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995).  To show prejudice, a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions." Hollis v. Davis, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).  The petitioner must show at least a reasonable probability that the result of the proceeding would have been different.  Henderson v. Campbell, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if review is necessary to correct a fundamental miscarriage of justice.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Henderson v. Campbell, 353 F.3d at 892.  This exception is available only "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent."  Henderson v. Campbell, 353 F.3d at 892.  The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence.  Johnson v. Alabama, 256 F.3d 1156, 1171 (2001) (citing Calderon v. Thompson, 523 U.S. 538, 559 (1998); Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent").  To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense.  Schlup v. Delo, 513 U.S. 298, 327 (1995).  In addition, " '[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial."  Calderon, 523 U.S. at 559 (quoting Schlup, 513 U.S. at 324) (explaining that "[g]iven the rarity of such evidence, in virtually every case, the allegation of actual

innocence has been summarily rejected") (internal quotation marks omitted).  Schlup

states that the petitioner must show constitutional error coupled with "new reliable

evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness

accounts, or critical physical evidence -- that was not presented at trial."  Schlup, 513

U.S. at 324

## State Law Claims

Generally, a claim alleging a violation of state law is not subject to review by a

petition for the writ of habeas corpus.  Pulley v. Harris, 465 U.S. 37, 41 (1984);

McCullough v. Singletary, 967 F.2d 530, 535-36 (11th Cir.1992).  To the extent raised in

a federal habeas petition, a federal question is not exhausted in state court if raised in

state court only as a state law claim.  Anderson v. Harless, 459 U.S. 4, 6-8 (1982).  A

federal claim not "fairly presented" to a state court is procedurally defaulted for federal

habeas purposes.  Baldwin v. Reese, 541 U.S. 27 (2004).

## Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of trial counsel, a petitioner must

meet the two-part test in Strickland v. Washington, 466 U.S. 668 (1984).  See Heath v.

Jones, 941 F.2d 1126, 1130 (11th Cir. 1991), cert. denied, 502 U.S. 1077  (1992).

Strickland's two-part test requires a petitioner to demonstrate that counsel's

performance was deficient and "there was a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

941 F.2d at 1130.  However, if a claim fails to satisfy the prejudice component, the court

need not rule on the performance component.

Bolender v. Singletary, 16 F. 3d 1547, 1556-57 (11th Cir. 1994), clarifies that in order to obtain the reversal of a conviction of a death sentence on ineffective assistance of counsel grounds, a petitioner must show both (1) that the identified act or omission of counsel was either deficient or outside the wide range of professionally competent assistance and (2) that the deficient performance prejudiced the defense such that, without the error, a reasonable probability exists that the balance of aggravating and mitigating circumstances would have differed.

## Brecht v. Abrahamson

Finally, if constitutional error occurred, the applicable harmless error standard is enunciated in Brecht v. Abrahamson, 507 U.S. 619 (1993), which is "less onerous" than the harmless error standard in Chapman v. California, 386 U.S. 18 (1967).  "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' "  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

## DISCUSSION

Given the respondent's acceptance of the procedural history as stated by Shere and given that the respondent specifically waives exhaustion, a recitation of the procedural history of Shere's criminal conviction is unnecessary.  (See Doc. 62 at pp. 1, 15).  The issues are fully briefed and the case is ripe for decision.  No evidentiary hearing is necessary because the record is fully developed and the claims of the petition

raise issues of law, not issues of fact.  See Breedlove v. Moore, 279 F.3d 952, 959

(11th Cir. 2002).[1]

Because of the deference due the state court's findings of fact and conclusions of

law, the state courts' determination of Shere's claims largely governs review of those

same claims.  Consequently, in determining the reasonableness of the state courts'

determinations, the review of Shere's claims includes a recitation of the pertinent state

court analysis.

Ground One

THE PROSECUTOR'S IMPROPER REMARKS AND BIBLICAL
REFERENCES DURING THE PENALTY PHASE RENDERED MR.
SHERE'S DEATH SENTENCE UNRELIABLE IN VIOLATION OF THE
FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE
U.S. CONSTITUTION AND THE CORRESPONDING PROVISIONS OF
THE FLORIDA CONSTITUTION.  APPELLATE COUNSEL WAS
INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM ON DIRECT
APPEAL.

Shere's Alleged Facts in Support of Ground One

Shere alleges that the state prosecutor improperly and prejudicially injected

religious authority into the penalty phase of his trial.  Specifically, Shere complains that

during cross-examination of three separate witnesses, the prosecutor referred to the

"Ten Commandments," "God's law," Romans 6:23, and Chapter 21 of the biblical book

of Exodus.  According to Shere, the state by these biblical allusions invoked, and

suggested the jury follow, a higher law than the law of the state of Florida.

---

[1] The trial court conducted an evidentiary hearing.  Its findings are "presumed to be correct"
(28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable
determination of the facts. . . . " (28 U.S.C. § 2254(d)(2)).

- 9 -

<u>Specific Instances Alleged by Shere</u>

<u>First Instance--Deanne Judith Simpson</u>

During his cross-examination of the defense mitigation witness Deanne Judith

Simpson, Shere's sister, the prosecutor referred to "God's Law" and the Ten

Commandments.  Although the defense counsel objected and the court sustained the

objection, the court delivered no curative instruction to the jury.  This exchange

occurred:

> BY THE PROSECUTOR:
>
> Q:   And you've described your brother as a religious
>      man.  Is that right?  He believes in God?
>
> A.   Yes.
>
> Q.   He believes in God's law?
>
> A.   He does now.
>
> Q.   Yes, ma'am.  Do you know whether or not he's
>      aware of the Ten Commandments, the
>      commandment against taking another human life?
>
> [DEFENSE COUNSEL]:  I'm going to object to that, Your Honor.  She
>      can't say what he's aware of.  It's irrelevant.
>
> THE COURT:  Objection sustained.

(Exhibit A-5 at p. 884)

<u>Second Instance--Reverend Rose Grindhein Sims</u>

According to Shere, the second instance of improper biblical invocation by the

state occurred during the state's cross-examination of Rose Grindhein Sims, pastor of

Trilby United Methodist Church, who testified as a mitigation witness during the penalty

phase.  During the following exchange, the prosecutor characterized himself as a

Baptist, quoted a portion of Romans 6:23, and alluded to the Ten Commandments:

BY THE PROSECUTOR:

Q.   Reverend Sims, you indicated earlier, I think, that
you counseled with Rick--

A.   Yes.

Q.   --about Christ and his Christian faith.  Is that
correct?

A.   Yes, I sure did.

Q.   And that was sometime prior to December of
1987.  Is that correct?

A.   Yes, sir.

Q.   And correct me if I'm wrong.  I'm Baptist and I
think basically we believe the same thing.

A.   I was a Baptist minister's wife for many years.

Q.   When you counseled with him, you explained to
him, did you not, that he has personal
responsibility for his sins.  Is that right?

A.   Absolutely.

Q.   And that he is responsible before God and
everybody else for the sins he's committed.  Is that
correct?

A.   Yes.  That we confess them to Christ and he
forgives them.

Q.   And he understood that concept.

A.   He understood that one sin, but all of us have
sinned.  All of us have done things wrong.

Q.      Absolutely.  And the wages of sin is death.

A.      Exactly.

Q.      Did you discuss with Rick, I'm sure, sins and the
        Ten Commandments, and that one of the sins is
        thou shalt not kill or commit murder.  Correct?

(Exhibit A-5 at pp. 902-03)

Shere contends that the prosecutor's biblical quotation that "the wages of sin is

death" and his allusion to the Ten Commandments constitutes fundamental error.[2]  The

defense elected not to object at this moment, although Shere concedes that the defense

_____

[2] The prosecutor borrowed the phrase "the wages of sin is death" from Romans 6:23, which
is part of this four-verse message (as rendered in the King James version):

20      For when ye were the servants of sin, ye were free from righteousness.

21      What fruit had ye then in those things whereof ye are now ashamed? for the
        end of those things is death.

22      But now being made free from sin, and become servants to God, ye have
        your fruit unto holiness, and the end of everlasting life.

23      For the wages of sin is death; but the gift of God is eternal life through Jesus
        Christ our Lord.

Neither these four verses considered together nor Romans 6:23 considered separately addresses the
question of the condign punishment for murder (or any other offense).  These verses convey a
Christian message about those (the righteous) whom Christians believe will enjoy everlasting life after
death and those (the sinners) whom Christians believe will experience only death after death.  In
either case a living person dies, and Romans 6:23 addresses only the prospects after death.  The
prosecutor's use of the phrase "the wages of sin is death" hardly rises to the level of an effective
invocation of the Bible's perceived authority.  A non-Christian juror is decidedly unmoved by a New
Testament citation; a Christian juror (or another person conversant with the Bible) knows that the
familiar words of Romans 6:23 say nothing about the reasons for, or the means of, a living person's
earthly death, by execution or otherwise, and would dismiss Romans 6:23 as irrelevant to the issue at
hand because "death" in Romans 6:23 means to a Christian the loss of everlasting life and not earthly
death as a punishment for sin.  Of course, neither a courtroom nor a judicial order is an appropriate
place for hermeneutics, which fact illustrates why precedent disfavors the introduction of religion into,
among other things, a sentencing.  See e.g., Romine v. Head, 253 F.3d 1349, 1359-71 (11th Cir.
2001); Ford v. Schofield, _____ F. Supp.2d _____, 2007 WL 1390673 at *45-47 (N.D. Ga., May 11,
2007) (Thrash, J.).

- 12 -

objected during the prosecutor's later cross-examination of Reverend Sims, during

which this exchange occurred:

BY THE PROSECUTOR:

Q.    --does not the Bible teach, I'm sure you explained
       to Rick, that regardless of that forgiveness, he still
       has personal responsibility for the act that he
       committed on Christmas of 1987?

[DEFENSE COUNSEL]:  Objection.  That's been asked and
       answered, his personal responsibility.

THE COURT:  Overruled.

BY THE PROSECUTOR:

Q.    Is that correct, ma'am?

A.    Sir, I have never said that he committed an act on
       Christmas Eve.

Q.    If  this jury has found that he committed murder on
       Christmas 1987, is he not, before God and
       everybody else, personally responsible for that
       act?

* * * *

Q.    Okay.  Do you hold a personal belief about the
       death penalty?

A.    I don't believe that that's the question here, and I
       don't think that that is--

Q.    Ma'am--

A.    Yes.

Q.    --I'm sorry.  I don't mean to interrupt, but--

[DEFENSE COUNSEL]:  Your Honor, I'm going to have to object to
       this question.

THE COURT:  Objection overruled.

BY THE PROSECUTOR:

    Q.    Would you answer the question, please, ma'am?

    A.    I don't believe that is the question here.  I think there's a whole lot of difference between a Bundy and a boy like this.

    [PROSECUTOR]:  Your Honor, would you instruct the witness--

    THE COURT:  Ma'am, just answer the question.  It calls for a yes or no, or if you feel like a yes or no is inadequate, then I'll let you explain it.

    THE WITNESS:  I think a yes or no is inadequate.

    THE COURT:  Then you've got to say one or the other and then explain it.

    A.    Okay.  I believe that there are circumstances.

    Q.    Yes, ma'am.

    A.    Right.

    Q.    Circumstances that would warrant a death penalty.

    A.    Yes.  When there is absolute evidence, when there are fingerprints,--

(Exhibit A-5, pp. 903-06)

### Third Instance--Richard Earl Shere, Jr.

Shere contends that another instance of improper biblical citation occurred when Shere testified during the penalty phase.  Shere objects to both the prosecutor's biblical references and the prosecutor's question whether Shere afforded Snyder a Christian

burial.  Defense counsel objected to the prosecutor's quotation from Exodus, and the

judge sustained the objection; however, no curative instruction followed.

Shere contends that this last example was particularly prejudicial because,

despite the judge's sustaining the objection, Shere answered the improper question and

agreed "with the penalty of death based on biblical law."  This exchange occurred:

BY THE PROSECUTOR:

> Q.   Okay, You talked quite a bit with your attorney
> about your religious beliefs and you indicated, I
> think, that you have strong feelings about the Lord
> and you've been saved.  Is that true?
>
> A.   Yes.
>
> Q.   I think you went on to say that you had been
> reading the Bible and learning about the laws that
> God said apply to your life.  Is that true?
>
> A.   Yes, sir.
>
> Q.   You know that one of those laws that God says
> applies to your life and everybody's life is one of
> the Ten Commandments, thou shalt not kill.  Is
> that correct?
>
> A.   Yes, sir.
>
> Q.   Do you believe that applies to you, sir?
>
> A.   Yes, sir.  I believe that applies to everyone.
>
> Q.   Right.  Also, a little bit further in that same book,
> Exodus Chapter 21, more laws are given to Moses
> for the people of Israel.  Part of those laws say
> that if a man lies in wait or premeditates the death

of another man and by doing that kills him that the sentence is death.[3]

[DEFENSE COUNSEL]:  Your Honor, I'm going to have to object to this.

Q.    Do you agree with that?

THE COURT:  Objection sustained.

A.    Yes, I believe--

Q.    Shere, you said that you said a prayer for Drew and that was after his death.  Is that right?

A.    Yes, sir.

Q.    Did you do anything to give him a Christian burial on Christmas of 1987?

[DEFENSE COUNSEL]:  Object, Your Honor.

THE COURT:  Objection overruled.

A.    He was buried in a really beautiful place and I said a prayer over the grave after I was forced to cover him up.

---

[3] The prosecutor invokes Chapter 21 of Exodus, the chapter containing the familiar "eye for eye, tooth for tooth" admonition (Exodus 21:24).  Again, this argument is impotent.  A nonbeliever remains unmoved by a biblical citation, and a believer recognizes immediately that Chapter 21 of Exodus addresses the actions of an individual and says nothing of the rights of the duly constituted state acting under duly constituted law.  Of course, a Christian also recognizes the preeminence of, for example, Matthew 5:20-26 and 38-42.  In fact, the invocation of the Bible or Christianity equates automatically to no particular view of the death penalty, about which Christians and other believers in the Bible have differed for hundreds of years and differ today.  A prosecutor who adverts to the Bible as if the Bible directs only one, generally agreed view of the death penalty stands athwart a lively and contrary history.  For example, E. Christian Brugger's Capital Punishment and Roman Catholic Moral Tradition (Notre Dame Univ. Press 2003) details the Catholic struggle with the issue.  The Christian debate on the death penalty is further informed by comparing Pope John Paul II's "Evangelium Vitae" of March 25, 1995, at paragraph 56 with the June, 2000, Resolution 5 of the Southern Baptist Convention, "On Capital Punishment."  See also Owens, Carlson, and Elshtain (eds.), Religion and the Death Penalty:  A Call for Reckoning (Eerdmans, 2004) (an anthology elaborating the persistent theological controversy about capital punishment).  As stated in footnote two of this order, this irresolvable issue about the Bible and capital punishment is inappropriate for either a courtroom or an order.  This footnote (as well as footnote two) illustrates only that the prosecutor's suggestion was, at best, debatable and unlikely to affect either believer or nonbeliever.

(Exhibit A-5 at pp. 949-51)

Shere concedes that the biblical references did not occur during the prosecutor's closing argument.  However, Shere contends that invoking the proposition that the Bible commands the death penalty diminished the jury's sense of responsibility and "displaced" Florida's law, as stated explicitly in the judge's instructions.  Finally, Shere alleges that, by failing to raise this issue on direct appeal, appellate counsel was ineffective in assisting his defense.

Ground One Lacks Merit

Shere raised this claim in his state habeas corpus petition, and the Florida Supreme Court denied relief:

> As to Shere's first claim, we find no ineffectiveness of appellate counsel in the failure to claim error in the prosecution's use of religious references during the penalty phase.  The record reflects not only the defense's failure to object in many instances, but also that the defense itself interjected the issue of religious belief into the proceedings.  While we have cautioned against such practice, we find no deficiency by appellate counsel here in light of the record.

Shere v. Moore, 830 So. 2d 56, 59 (Fla. 2002).

The Florida Supreme Court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law, nor does the decision differ from a decision of the United States Supreme Court on materially indistinguishable facts.  Accordingly, no basis exists for relief under the AEDPA.

Although Shere notes that "most of the state's biblical references were preserved for appeal by contemporaneous objection," (Doc. 50, Amended Petition, at 12), appellate counsel is not required to raise every possible claim on appeal to provide

constitutionally effective assistance.  Jones v. Barnes, 463 U.S. 745, 751-53 (1983); Smith v. Murray, 477 U.S. 527, 536 (1986) ("This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."); Heath v. Jones, 941 F.2d 1126, 1141 (11th Cir. 1991) (Edmondson, J., concurring).  Appellate counsel was not ineffective for failing to raise this claim.

To the extent that Shere argues that counsel should have raised a claim on appeal based on the "unobjected-to statements," the argument fails.  Florida has routinely applied the contemporaneous objection rule, which requires a timely objection at trial in order to preserve an issue for review on appeal.  See, e.g., State v. Cumbie, 380 So. 2d 1031 (Fla. 1980); Clark v. State, 363 So. 2d  331 (Fla. 1978).  If a claim is not preserved for appellate review, counsel cannot have been ineffective for failing to raise that claim on appeal.  Davis v. State, 928 So. 2d 1089 (Fla. 2005); Rodriquez v. State, 919 So. 2d 1252 (Fla. 2005); Zack v. State, 911 So. 2d 1190, 1204-05 (Fla. 2005).  Conversely, if trial counsel's objection were sustained, which is the case with most of the complained-of statements, the record presents neither an adverse ruling in the first instance nor anything to appeal as a consequence.

Shere has cited no case for the proposition that a biblical reference is fundamental error which can be reviewed on appeal without the need for a contemporaneous objection.  Shere's claim is, at most, a claim of state law error.  An error of state law is not cognizable in federal habeas, and Shere cites no authority for the proposition that his claim implicates the federal constitution.

Finally, as the Florida Supreme Court notes, Shere himself injected religion into the proceedings:

> The defendant's trial attorneys tried to develop statutory and non-statutory mitigating circumstances by diligently investigating the defendant's background.  <u>Based on what they were told by the defendant and his sister they developed a theme that the defendant was a kind, gentle, God-fearing man, who suffered emotionally as a result of his parents' divorce and who was a follower by nature.</u>  They presented that evidence to the jury.  The fact that the jury, and this court, failed to find that evidence of sufficient weight to recommend a life sentence does not establish that the defendant's trial counsel were ineffective.

<u>Shere v. State</u>, 742 So. 2d 215, 224 (1999).  [emphasis added].  Shere cannot both present a defense that prominently features religion and preclude the state from testing that defense through cross-examination.  Shere chose to present mitigation that featured his supposed Christianity, and he should not be heard to complain because the state explored the bona fides and implications.

Furthermore, Shere's "religion defense" resulted in the jury's returning a 7-5 recommendation for the death penalty.  Shere speculates that more jurors might have recommended a life sentence if the state had not aggressively explored the "religion defense."  However, considering the egregious facts of this case, had Shere not presented the "religion defense," more jurors might have recommended the death penalty.  See <u>Brown v. Payton</u>, 544 U.S. 133 (2005) (jury may consider mitigating evidence of post-crime religious conversion at the penalty phase of a criminal trial).  <u>See also</u>, <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005) (jury's consideration of passages from the Bible during deliberation did not deprive petitioner of fair trial).

Ground one does not warrant habeas corpus relief.

<u>Ground Two</u>

MR. SHERE'S DEATH SENTENCE IS DISPROPORTIONATE,
DISPARATE, AND INVALID IN VIOLATION OF THE FIFTH, SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS TO THE  U.S.
CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE
FLORIDA CONSTITUTION.  APPELLATE COUNSEL WAS  INEFFECTIVE
FOR FAILING TO RAISE THIS ISSUE ON DIRECT APPEAL.

<u>Shere's Alleged Facts in Support of Ground Two</u>

Shere alleges that his sentence is disproportionate because Bruce Demo, who
was tried separately for second degree murder, received a life sentence.  Shere claims
that his penalty-phase jury never was informed of, and consequently never considered,
Demo's life sentence as a mitigating circumstance.  Shere contends that Demo was the
instigator of the murder (Exhibit A-2 at p.  257), that Demo fired the three fatal shots,
and that Demo was equally, if not more, culpable in the murder.  Shere alleges that
appellate counsel's failure to raise this  issue on direct appeal denied Shere effective
assistance of appellate counsel.

Shere emphasizes that during opening statement the prosecutor acknowledged
that Demo telephoned Shere on the night of the murder and that Demo participated in
the murder.  (Exhibit A-2 at p. 257)  Darlene O'Donnel testified during the state's case-
in-chief (Exhibit A-4 at pp. 693-703) that she lived with her aunt during the time of the
murder and that Demo also lived there.  (Exhibit A-4 at p. 694)  O'Donnel testified that in
the early morning of December 25, 1987, Demo used the telephone and left the house.
(Exhibit A-4 at pp. 695-97)  She watched from her bedroom window while Demo and
Shere departed in Shere's car.  (Exhibit A-4 at pp. 696-97)  She also testified that Demo
carried a weapon every time he left the residence.  (Exhibit A-4 at p. 699)  O'Donnel

testified that she saw Demo return about 4:00 a.m. on December 25, 1987, and

afterward heard the washing machine.  (Exhibit A-4 at p. 701)

During the defense's case-in-chief, Detective Alan Arica testified that he

interviewed O'Donnel and Demo and that O'Donnel told him that Demo sounded angry

when she heard him on the telephone during the early morning hours of December 25,

1987.  (Exhibit A-4 at pp. 751-55)  During direct examination Detective Arica further

testified that O'Donnel said the following:

> Bruce was in the bedroom and she was out in the living room, but
> there was a thin wall between the two of them and she could hear Bruce
> sounding like he was angry talking to someone, saying he was angry with
> Drew, something to the effect that he was tired of Drew's bullshit or
> something like that.  And she was later awake when--and then I go into how
> she was awake when Rick came over to pick up Bruce.  (Exhibit A-4 at
> p. 753)

Detective Arica also interviewed Demo.  (Exhibit A-4 at p. 755)  Detective Arica

testified that Demo admitted firing two shots to the victim's head and one shot to the

victim's heart.  (Exhibit A-4 at p. 755)  During his testimony, Detective Arica recounted

other details of his interview with Demo:

BY DEFENSE ATTORNEY:

Q.   What did he say when he began his confession about the
     shots he had fired?

A.   That Bruce Demo had fired?

Q.   That's correct.

A.   He stated that he fired shots from the revolver secondary to
     Mr. Shere firing shots.

Q.    After the statement that Mr. Blade said, [sic] what was the first thing and how did he begin his confession?  What were his exact words?  I believe it's a quote in your report.

A.    Okay.  After he stated that, "He ran out of bullets.  That's why he didn't shoot me," he then--Mr. Demo realized that he had made an incriminating statement regarding his involvement in the case.  So he then made another statement shortly after that.  I guess he was thinking things over in his mind, and he said, "I fired the fatal shot."

Q.    What other shots did Demo tell you he inflicted on Drew Paul Snyder?

A.    He told me that he fired two shots into the head of Drew Snyder and a third shot into Mr. Snyder's heart, into the chest area.

Q.    Did he tell you where in the head he shot him?

A.    Yes.  He indicated that the first shot that he fired, Mr. Snyder was laying in the back seat of the car and he believed that he was laying face down, and he fired one shot into the back of Drew Snyder's head.

Q.    Did he say he noticed any blood at that time?

A.    He said that when the shot was fired, he noticed blood spurting up from Mr. Snyder's head.

Q.    What was the next shot he told you he fired?

A.    He said that Drew was then pulled from the vehicle.  He said they pulled him out.  I don't think we clarified which one of them pulled him from the vehicle, but once Drew was on the ground laying face up, then he fired another shot into Mr. Snyder's forehead, into the front of his head.

Q.    And then he told you he fired another shot?

A.    Yes. He said he fired a third shot into his chest.

Q.    Did he tell you who dug the grave?

A.     Yes.  He said that Richard Shere dug the grave.

Q.     Did he say Rick did that voluntarily or that he made him do it?

A.     He told us that he made Richard dig the grave.

(Exhibit A-4 at pp. 753-56)

Dr. LaMay, who had testified in the state's case-in-chief regarding the cause of death, testified that the head and chest wounds were the fatal shots and that death would have ensued within minutes.  (Exhibit A-3 at pp. 557, 569)  Dr. LaMay testified that a fourth wound would have proven fatal within an hour (Exhibit A-3 at p. 589) but that prompt medical attention would have offered a prospect of survival.  (Exhibit A-3 at p. 589)

Shere's sentencing memorandum discusses proportionality (Exhibit A-8 at p. 1461; see also cases mentioned at Exhibit A-8 at p. 1444) and states in pertinent part:

> Proportionality in the treatment of defendants and codefendants has been the basis of a major nonstatutory mitigating circumstance.  On May 4, 1989, a jury found Bruce Demo guilty of Second Degree Murder.  He was sentenced to an (upward departure sentence) of life imprisonment.[4]

Shere alleges that the same facts and circumstances govern both Demo's and Shere's sentence.  (Exhibit A-8 at p. 1461)  Shere contends that the trial judge failed to consider the disproportionate sentences as mitigation.  (See Exhibit A-8 at p. 1456)

---

[4] Demo's sentencing guidelines range for second degree murder was 12-17 years.  However, the trial judge departed upward and sentenced Demo to life imprisonment.  The trial judge's four stated reasons for an upward departure were (1) the execution style murder was brutal and without pretense of legal or moral justification, (2) the murder was so egregious and brutal as to require a departure, (3) Demo's criminal history (three felony convictions) demonstrated a pattern of escalating criminal conduct, and (4) Demo was a danger to the public.  See Case No. 8:98-cv-1641-27MSS, Document 22 at page 3.

Furthermore, according to Shere, the trial judge failed in the findings of fact

accompanying the sentencing order (Exhibit A-8 at pp. 1454-58) to address

meaningfully the relative culpability of Shere and Demo.

<u>Ground Two Lacks Merit</u>

Ground two is not cognizable because proportionality review is not constitutionally

required.  <u>Pulley v. Harris</u>, 465 U.S. 37 (1984).  Although Shere raises the

proportionality claim in terms of ineffectiveness of appellate counsel, the claim merely

attempts to obtain proportionality review, which is otherwise unavailable.  Moreover, the

Florida Supreme Court has spoken directly to Shere's claim that Demo dominated

Shere and that Shere was only an accessory and "an unwilling and threatened

participant" in the murder.  Affirming the denial of Shere's Rule 3.850 motion, the Florida

Supreme Court stated:

> As his final claim, Shere asserts that Florida's death penalty statute is
> unconstitutional as applied to him based upon the credible and material
> factual evidence presented throughout the judicial proceedings and
> because of the aggravators that were improperly applied to him.  He claims
> that at most the evidence reflected that Shere was an accessory, an
> unwilling and threatened participant.  This claim is procedurally barred and,
> in the alternative, without merit.  Shere has already litigated the sufficiency
> of the evidence presented at trial and has had that decision reviewed by
> this Court.  <u>See</u> <u>Shere</u>. Moreover, Shere is also barred because he did not
> raise this claim in his 3.850 motion.  <u>See</u> <u>Doyle</u>, 526 So. 2d at 911.  <u>Shere</u>
> <u>v. State</u>, 742 So. 2d at 218 n.7.

In deciding the proportionality claim in Shere's state habeas petition, the Florida

Supreme Court held:

> In this case, however, we cannot conduct a true relative culpability
> analysis because the codefendant was convicted of second-degree murder.
> We cannot make a true comparison of a first-degree murder conviction and
> a second-degree murder conviction.  <u>See</u> <u>Steinhorst v. Singletary</u>, 638 So.

2d 33 (Fla. 1994) (because Hughes, the codefendant, was convicted of second-degree murder, his sentence of life imprisonment was not relevant to a claim of disparate sentencing).  A conviction of first-degree murder requires a finding by either a jury or the judge that the defendant committed a murder with premeditation or during the course of a felony enumerated in section 782.04(1)(a)2, Florida Statutes (1987).  When a defendant is convicted of second-degree murder, either a jury or the judge has determined that the defendant committed a murder by doing an act that was imminently dangerous to another and evincing a depraved mind regardless of human life, without any premeditated design, or that the murder was committed during the course of a felony by a person who was not engaged in the perpetration of that felony.  See § 782.04(2) - (3), Fla. Stat. (1987).  In other words, a conviction of second-degree murder means the defendant did not form the necessary intent to commit first-degree murder and did not commit the murder during the perpetration or attempt to perpetrate drug trafficking, arson, sexual battery, robbery, burglary, kidnapping, escape, aggravated child abuse, aggravated abuse of the elderly or disabled, aircraft piracy, carjacking, home invasion robbery, aggravated stalking, murder of another human, or unlawful throwing, placing or discharging of a destructive device or bomb.  Because Shere's codefendant was convicted of second-degree murder, his relative culpability [footnote omitted] for this murder has already been determined to be less than Shere's culpability.

    This situation is not unlike the one we addressed in Larzelere v. State, 676 So. 2d 394 (Fla. 1996).  In Larzelere, we found a sentence of death proportional where the codefendant was acquitted.  In so finding, we noted "that Jason's acquittal is irrelevant to this proportionality review because, as a matter of law, he was exonerated of any culpability." Id. at 407.  Similarly, in this case a separate jury has determined Shere's codefendant to be less culpable, evidenced by his conviction for second-degree murder.  On the other hand, equally culpable connotes the same degree of blame or fault. In order to have that same degree of blame or fault the codefendants must, at a minimum, be convicted of the same degree of the crime; third-degree murder does not connote the same degree of blame or fault as second-degree murder, which does not connote the same degree of blame or fault as first-degree murder.  It is the crime for which the defendant is convicted that determines his or her culpability, and in this case that decision has been made by the trier of fact.

Shere v. Moore, 830 So. 2d at 61-62. [emphasis added].  Even if this proportionality

claim were cognizable in federal habeas, the findings of the Florida Supreme Court are

neither contrary to, nor an unreasonable application of, clearly established federal law, and, accordingly, offer no basis for relief.[5]

Finally, Shere raised in no state court proceeding the federal substantive proportionality claim raised in the present petition.  Shere raised the proportionality issue only as a state law claim.  Because he pled that claim as a state law claim, Shere failed to fairly present to the state courts the federal claim raised in this petition and, therefore, the claim is procedurally defaulted.  Baldwin v. Reese, 541 U.S. 27 (2004).

Ground two warrants no relief.

## Ground Three

APPELLATE COUNSEL WAS INEFFECTIVE IN FAILING TO RAISE ON
DIRECT APPEAL AS A SEPARATE ISSUE THE TRIAL COURT'S
ERROR, IN VIOLATION OF THE FIFTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE U.S. CONSTITUTION, BY IMPROPERLY
CONSIDERING THE STATUTORY MITIGATOR OF NO SIGNIFICANT
PRIOR CRIMINAL HISTORY.

### Shere's Alleged Facts in Support of Ground Three

Shere alleges that he had no significant criminal history and that the trial court erroneously failed to find this mitigator.  Further, Shere asserts that the appellate counsel was ineffective for failing to raise this issue on direct appeal.

Shere contends that during the penalty phase defense counsel argued to the jury, "You can consider that he has no significant history of prior criminal activity.  He told you that he has never been convicted of a felony before last week."  (Exhibit A-5 at p. 975) The jury was also instructed that one of the statutory mitigating circumstances they

---

[5] Clearly established federal law forecloses a federal court's undertaking the proportionality review Shere seeks.

could consider was that "[t]he defendant has no significant history of prior criminal activity."  (Exhibit A-5 at p. 982)  Shere's lack of criminal history was contested by the state neither to the jury during the penalty phase (Exhibit A-5 at pp. 953-70) nor to the judge during the sentencing phase.  (Exhibit A-7 at pp. 1371-76)

Shere argues that this statutory mitigator was further emphasized in the defendant's sentencing memorandum, in which the defendant argued that this statutory mitigator was proven at trial because "[Shere] has no significant history of prior criminal activity and none was alleged nor proven by the state."  (Exhibit A-8 at p. 1460)

<u>Ground Three Lacks Merit</u>

The trial judge addressed mitigation in the original sentencing order:

> Defendant was on pretrial release on pending charges of Burglary of a Dwelling and Robbery when the murder was committed.  By his own admission in the presentence investigation, Shere was selling and using illegal drugs at the time of the offense and had been using marijuana since age thirteen.  Convictions are not required to negate a mitigating factor of no significant history of prior criminal activity.  <u>Quince v. State</u>, 477 So. 2d 535 (Fla. 1985).

(Exhibit A-8 at p. 1456)

The Florida Supreme Court addressed the issue in denying Shere's state habeas corpus petition and in affirming the denial of Shere's Rule 3.850 motion.  In the first instance, the Florida Supreme Court held:

> In his third claim, Shere argues that the trial court improperly failed to find the mitigating circumstance of "no significant prior criminal history." The record reflects, however, that the trial court properly found that Shere's own admission of prior criminal behavior negated a finding of this mitigating circumstance.

<u>Shere v. Moore</u>, 830 So. 2d at 59-60.  In affirming the denial of Shere's Rule 3.850

motion, the Florida Supreme Court held:

> Shere argues that the court gave inadequate consideration to
> Shere's age and lack of a prior adult criminal record.  These claims are also
> procedurally barred because they should have been raised on direct
> appeal.  In fact, Shere did raise the issue of prior adult criminal record on
> direct appeal. Moreover, in his sentencing order, the trial judge specifically
> noted that Shere was on pretrial release pending trial on burglary and
> robbery charges and by his own admission, was selling illegal drugs at the
> time of the murder.  We upheld these findings in <u>Shere</u>, 579 So. 2d at 95.

<u>Shere v. State</u>, 742 So. 2d at 218.  These findings by the Florida Supreme Court are

neither contrary to, nor an unreasonable application of, clearly established federal law.

Habeas relief is not available to Shere on this claim.

Ground three in Shere's present petition is nothing more than a claim that a

different appellate counsel might have briefed an appellate issue differently from

Shere's appellate counsel.  Of course, speculation about the contents of a different brief

by a different lawyer is not pertinent to the standard for establishing ineffectiveness of

counsel and offers no basis for relief (even assuming that the sentencing court's

rejection of a particular mitigator presents a federal constitutional claim).

Ground three warrants no relief.

Ground Four

MR. SHERE'S EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND
UNUSUAL PUNISHMENT WILL BE VIOLATED AS HE MAY BE
INCOMPETENT AT TIME OF EXECUTION.

Shere concedes that his claim of incompetence is premature under Florida law

because no death warrant has issued.  <u>See</u> <u>Martinez-Villareal v. Stewart</u>, 523 U.S. 637

(1998); <u>In re Medina</u>, 109 F.3d 1556 (11th Cir. 1996).  Further, Shere acknowledges

- 28 -

that judicial review in Florida must await Shere's submission in accordance with Florida Statutes of his claim of incompetence.[6]  Shere raised this admittedly premature claim in his state habeas corpus petition.  <u>Shere v. Moore</u>, 830 So. 2d at 60.  Shere again raises this claim merely for preservation.  His allegation states no claim for relief.

 Ground four is purely speculative and warrants no relief.

---

[6] See section 922.07, Florida Statutes (2007) which reads:

**922.07. Proceedings when person under sentence of death appears to be insane**

(1) When the Governor is informed that a person under sentence of death may be insane, the Governor shall stay execution of the sentence and appoint a commission of three psychiatrists to examine the convicted person. The Governor shall notify the psychiatrists in writing that they are to examine the convicted person to determine whether he or she understands the nature and effect of the death penalty and why it is to be imposed upon him or her. The examination of the convicted person shall take place with all three psychiatrists present at the same time. Counsel for the convicted person and the state attorney may be present at the examination. If the convicted person does not have counsel, the court that imposed the sentence shall appoint counsel to represent him or her.

(2) After receiving the report of the commission, if the Governor decides that the convicted person has the mental capacity to understand the nature of the death penalty and the reasons why it was imposed upon him or her, the Governor shall immediately lift the stay and notify the Attorney General of such action. Within 10 days after such notification, the Governor must set the new date for execution of the death sentence. When the new date for execution of the death sentence is set by the Governor under this subsection, the Attorney General shall notify the inmate's counsel of record of the date and time of execution.

(3) If the Governor decides that the convicted person does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him or her, the Governor shall have the convicted person committed to a Department of Corrections mental health treatment facility.

(4) When a person under sentence of death has been committed to a Department of Corrections mental health treatment facility, he or she shall be kept there until the facility administrator determines that he or she has been restored to sanity. The facility administrator shall notify the Governor of his or her determination, and the Governor shall appoint another commission to proceed as provided in subsection (1).

(5) The Governor shall allow reasonable fees to psychiatrists appointed under the provisions of this section which shall be paid by the state.

Ground Five

THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
COUNSEL BY POST-CONVICTION COUNSEL IN VIOLATION OF THE
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION.

On pages 28-36 of the petition, Shere asserts entitlement to relief based on

"ineffective assistance of post-conviction counsel."  Shere neither cites supporting

authority nor distinguishes precedent directly to the contrary.

Shere raised this claim on appeal from the denial of Shere's Rule 3.850 motion.

The Florida Supreme Court denied relief, stating:

> Shere also raises an ineffective assistance of post-conviction counsel
> claim.  Shere argues that although post-conviction counsel filed twenty-
> three claims, he failed to prove these claims and was deficient in his overall
> performance at the evidentiary hearing.  However, ineffective assistance of
> counsel claims must be raised in the court in which the alleged
> ineffectiveness occurred, not on the appeal of the denial of Shere's 3.850
> motion.  See generally Knight v. State, 394 So. 2d 997 (Fla. 1981);
> Richardson v. State, 624 So. 2d 804 (Fla. 1st DCA 1993); Turner v. State,
> 570 So. 2d 1114 (Fla. 5th DCA 1990).  Moreover, we have not recognized
> ineffective assistance of post-conviction counsel claims.  See Lambrix v.
> State, 698 So. 2d 247, 248 (Fla. 1996) (citing Murray v. Giarratano, 492
> U.S. 1, 106 L. Ed. 2d 1, 109 S. Ct. 2765 (1989), and Pennsylvania v.
> Finley, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987)), cert.
> denied, 522 U.S. 1122, 118 S. Ct. 1064, 140 L. Ed. 2d 125 (1998).

Shere v. State, 742 So. 2d at 218 n.6.  Giarratano, Finley, and the other cited decisions

of the United States Supreme Court confirm the unavailability of a claim for the right to

the "effective assistance of post-conviction counsel."  The Florida Supreme Court's

decision is not contrary to, or an unreasonable application of, clearly established federal law.  No basis exists for relief under the AEDPA.[7]

To the extent construed to include an allegation that the mental health expert called by the defense at the post-conviction evidentiary hearing was ineffective, Shere's claim presents formidable obstacles.  Ake v. Oklahoma, 470 U.S. 68 (1985), requires that Shere have a mental health expert of his choosing.  Shere had that expert. Because Ake is based exclusively on the Due Process Clause and because Shere had a mental health expert, Shere cannot identify any process he was due that he did not receive.  See Clisby v. Jones, 960 F.2d 925 (11th Cir. 1992).  The state post-conviction court's discrediting or discounting the testimony of Shere's expert establishes no due process violation.  Shere has not specified what post-conviction counsel should have done (short of instructing the witness to lie under oath).

Ground five warrants no habeas corpus relief.

Ground Six

THE TRIAL COURT'S SENTENCING FINDINGS ARE IMPROPER AND MAKE IMPROPER USE OF STATUTORY AGGRAVATING CIRCUMSTANCES AND THE TRIAL COURT ERRED IN INSTRUCTING THE JURY DURING THE PENALTY PHASE AS TO THOSE PARTICULAR AGGRAVATING CIRCUMSTANCES IN VIOLATION OF MR. SHERE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

---

[7] Also, relief is unavailable to Shere because that result requires announcement of a "new rule" of law not retroactively available to Shere. Teague v. Lane, 489 U.S. 288 (1989).

<u>Shere's Alleged Facts in Support of Ground Six</u>

Pursuant to Section 921.141(5)(g), Florida Statutes (1987), the trial court found that Snyder's murder was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of law by eliminating an informer.  (Exhibit A-8 at p. 1454)  Shere alleges that Demo, not Shere, benefitted from eliminating Snyder, the alleged informer.  (Exhibit A-2 at p. 349; Exhibit A-3 at pp. 426-28)

Shere alleges that the state failed to produce evidence to show that Shere knew the victim was an informant and that the state consequently failed to prove Shere's knowledge beyond a reasonable doubt.  Shere claims that there was no testimony Shere knew that the victim was an active informant, that the victim had participated in the investigation, or that the information from the victim led to the investigation or arrest of Shere.  Shere alleges that the evidence must show that the dominant motive for the killing was the elimination of the witness.

According to Shere, the trial court's "Judgment and Sentence" (Exhibit A-8 at pp. 1454-55) fails to establish the requirements for the "hindering of a governmental function or the enforcement of laws" aggravator.  In fact, Shere alleges, Detective Arick relied upon Shere's statement that Demo had a motive for killing Snyder.  (Exhibit A-2 at pp. 371-72; Exhibit A-3 at pp. 426-28)

According to Shere, the uncontradicted testimony established that Demo, the shooter, was the one with a motive to seek Snyder's death.  During the penalty phase, Shere denied being the shooter (Exhibit A-5 at p. 949) and, according to Shere, no credible testimony contradicted him.

Additionally, Shere claims that the trial court relied on the "cold, calculated and premeditated" (CCP) aggravator under Section 921.141(5)(i), Florida Statutes (1987). According to Shere, this aggravator was not supported by the evidence.  The trial judge at the evidentiary hearing, according to Shere, erred in writing that Shere and ". . . his accomplice [Demo] planned the murder several hours before the actual killing."  (Exhibit G-15 at p. 2654)  Shere alleges that the record offers no credible evidence at any stage of the proceedings to support a CCP aggravator.

Shere alleges that with due diligence trial counsel could have established the state's failure to prove the CCP aggravator beyond a reasonable doubt.  Shere alleges that the failure of counsel to properly raise legal questions on both the weighing of statutory and possible non-statutory mitigators against the CCP and the former "disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws by eliminating an informer" aggravators constituted ineffective assistance of counsel.

Shere alleges that the court also erred in finding that ". . . the simple act of packing a shovel in the back of his car before picking up Drew Snyder . . . clearly established that [Shere] contemplated his actions carefully before the murder."  (Exhibit G-15 at p. 2654)  According to Shere, the uncontradicted testimony of Ms. O'Donnell and Shere refutes the trial judge's faulty recollection of the trial testimony.  According to Shere, the packing of the shovel clearly established that Demo contemplated his actions carefully before the murder.

In the "Judgment and Sentence" (Exhibit G-15 at p. 2654) and to help establish the grounds for a CCP aggravator, the trial judge wrote that Shere loaded a shovel into

- 33 -

the car.  But, according to Shere, the uncontradicted testimony is that Demo loaded the shovel into Shere's car.

Shere contends that the trial court denied the defense claims dealing with instructions on the CCP aggravator, even though the facts of the case establish no basis for the aggravator.  Shere claims that the record shows Shere was a passive personality in the commission of the crime and that Demo telephoned Shere (Exhibit A-2 at p. 349, Exhibit A-3 at p. 402, and Exhibit A-4 at p. 697); that Shere tried to dissuade Demo from killing Snyder (Exhibit A-3 at p. 403); that Demo had Shere come to Demo's house; and that Demo loaded the shovel into the car.  (Exhibit A-2 at p. 351, Exhibit A-3 at p. 404, Exhibit A-4 at p. 702)  In addition to the CCP aggravator, the trial court found that Shere had no pretense of moral or legal justification for the murder.  (Exhibit G-15 at p. 2654)

In the last paragraph of the factual basis of this claim, Shere alleges that he was denied substantive due process by the ineffectiveness of counsel in presenting and arguing his positions on the statutory aggravating circumstances.  Therefore, Shere concludes, the penalty-phase jury should not have been instructed as to the aggravating circumstances.

Ground Six Lacks Merit

According to Shere, ground six was raised on direct appeal and in the state post-conviction proceedings. On direct appeal, the Florida Supreme Court held:

> Shere's last claim attacks the trial court's penalty-phase instructions and findings.  Initially, Shere argues that the court erred by instructing the jury to consider whether the murder was committed to disrupt or hinder the lawful exercise of a governmental function or law enforcement.  <u>See</u>

- 34 -

§ 921.141(5)(g), <u>Fla</u>. <u>Stat.</u> (1987).  We disagree.  Substantial competent evidence properly introduced at trial supports beyond a reasonable doubt the finding that Shere and Demo plotted to kill Snyder because they believed Snyder had become a witness against them in an unrelated criminal case.  <u>See</u>, <u>e.g.</u>, <u>Francis v. State</u>, 473 So. 2d 672, 677 (Fla. 1985), <u>cert</u>. <u>denied</u>, 474 U.S. 1094, 106 S. Ct. 870, 88 L. Ed. 2d 908 (1986); <u>Lara v. State</u>, 464 So. 2d 1173 (Fla. 1985).  The trial court did not err in instructing the jury on a circumstance that was supported by the evidence.

Shere also argues that the trial court erred by finding the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.  § 921.141(5)(i), <u>Fla</u>. <u>Stat.</u> (1987).  Again we find substantial competent evidence to support the trial court's finding.  This circumstance requires proof of heightened premeditation, that is, "the evidence must prove beyond a reasonable doubt that the defendant planned or arranged to commit murder before the crime began."  <u>Porter v. State</u>, 564 So. 2d 1060, 1064 (Fla.1990); <u>see also</u>, <u>e.g.</u>, <u>Rogers</u>, 511 So. 2d at 533.  There is no evidence to reasonably suggest that Shere and Demo had any motive other than to kill Snyder.  They discussed killing Snyder before the murder, they obtained a shovel to bury the body, then they took Snyder to an isolated location where Snyder was shot ten times. <u>See</u>, <u>e.g.</u>, <u>Francis</u>, 473 So. 2d at 677; <u>Lara</u>, 464 So. 2d at 1173.

<u>Shere v. State</u>, 579 So. 2d at 95.  When Shere raised related and overlapping claims in

his Rule 3.850 motion, the Florida Supreme Court affirmed the trial court's denial of

relief, stating:

Shere also argues that credible trial evidence contradicts most of the court's findings on aggravators and mitigators.  To the extent Shere challenges the jury instructions given on the aggravators, the post-conviction court correctly found these claims procedurally barred because they should have been raised on direct appeal.  <u>See</u> <u>Jackson v. State</u>, 648 So. 2d 85, 90 (Fla.1994).

With regard to the CCP aggravator, we upheld its application to this case on direct appeal, <u>see</u> <u>Shere v. State</u>, 579 So. 2d 86, 95 (Fla.1991); therefore, Shere is precluded from relitigating this claim in his 3.850 motion. <u>See</u> <u>Jones v. Dugger</u>, 533 So. 2d 290, 292 (Fla.1988).

Shere also alleges that the statutory aggravator of hindering or disrupting the lawful exercise of a government function of law enforcement is not supported by the evidence.  In his rule 3.850 motion, Shere only

alleged that the jury was improperly instructed on this aggravator, a claim the court found procedurally barred pursuant to <u>Hardwick v. Dugger</u>, 648 So. 2d 100, 103 (Fla.1994).  Therefore, Shere cannot raise the sufficiency of the evidence for the first time on appeal.  <u>See</u> <u>Doyle v. State</u>, 526 So. 2d 909, 911 (Fla.1988).  Moreover, Shere would be procedurally barred from raising this claim because on direct appeal we held that this aggravator was supported by the evidence.  <u>See</u> <u>Shere</u>, 579 So. 2d at 95.

Shere argues that the court gave inadequate consideration to Shere's age and lack of a prior adult criminal record.  These claims are also procedurally barred because they should have been raised on direct appeal.  In fact, Shere did raise the issue of prior adult criminal record on direct appeal. Moreover, in his sentencing order, the trial judge specifically noted that Shere was on pretrial release pending trial on burglary and robbery charges and by his own admission, was selling illegal drugs at the time of the murder.  We upheld these findings in <u>Shere</u>, 579 So. 2d at 95.

<u>Shere</u>, 742 So. 2d at 218 n.7.

Shere's briefs in the Florida Supreme Court reveal that the federal constitutional claim in the present habeas petition has never been presented to the state courts. Shere's claims in the Florida Supreme Court were based on state law, errors of which are not cognizable in federal habeas review.  The federal claims in the present petition were not "federalized" in either state appeal, were never fairly presented to the state courts, and, therefore, were procedurally defaulted for habeas purposes.  <u>Baldwin v. Reese</u>, <u>supra</u>.

Alternatively, the most that Shere has pleaded is an error of state law that is not cognizable in a federal habeas proceeding.  <u>Pulley v. Harris</u>, <u>supra</u>.  Finally, the factual findings of the Florida Supreme Court are presumed correct, and Shere has presented no clear and convincing evidence to rebut the findings.  Those presumptively correct

findings establish that the two aggravators at issue were properly found and applied in

Shere's case.[8]

Furthermore, Shere has not shown that he raised this claim as an ineffective

assistance of counsel claim in state court.  Even if Shere could show that he raised the

claim, counsel was not ineffective under the Strickland standard.

Ground Six warrants no relief.

Ground Seven

THE TRIAL COURT ERRED IN DENYING THE MOTION TO INTERVIEW
JURORS IN VIOLATION OF MR. SHERE'S RIGHTS UNDER THE SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

Shere's Alleged Facts in Support of Ground Seven

After the trial, the court considered Shere's "Motion To Interview Jurors."  (Exhibit

A-8 at p. 1488)  The motion refers to Shere's motion for a new trial (Exhibit A-8 at

pp. 1483-87), which is based on two instances of alleged juror misconduct.  The first

was that a juror served although that juror's brother had been murdered.  This allegedly

---

[8] As to the third aggravating factor, the Florida Supreme Court stated:

We are not convinced, however, that the evidence supports the trial court's
finding as to the circumstance of especially heinous, atrocious, or cruel.
§ 921.141(5)(h), Fla.Stat. (1987). [FN19] As this Court recently explained, "[t]he
factor of heinous, atrocious or cruel is proper only in torturous murders-those that
evince extreme and outrageous depravity as exemplified either by the desire to inflict
a high degree of pain or utter indifference to or enjoyment of the suffering of
another." Cheshire v. State, 568 So. 2d 908, 912 (Fla.1990) (citing State v. Dixon,
283 So. 2d 1 (Fla.1983), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295
(1974)).

[FN19]. The trial court found that the murder was "especially evil, wicked, atrocious,
or cruel." We find no merit in Shere's claim that the trial court's failure to precisely
track the language of section 921.141(5)(h) of the Florida Statutes (1987) created
confusion on these facts.

Shere, 579 So. 2d at 95.

occurred notwithstanding that each prospective juror had been asked whether either the prospective juror or a relative had been the victim of a crime.  (Exhibit A-1 at p. 55)  The second instance of alleged misconduct was that two jurors knew Shere.[9]  The allegations of juror misconduct are based on a May 5, 1989, anonymous letter (Exhibit A-8 at pp. 1486-87), purportedly written by a juror.

Argument on the motion to interview and the motion for new trial dealt with whether the jurors had been asked if a member of the juror's family had been a victim of a crime.  (Exhibit A-8 at pp. 1517-30)  Shere contends that, from among the jurors first seated in the jury box before the start of <u>voir</u> <u>dire</u>, there were six potential jurors who ultimately were selected to serve as jurors to try this case.  (Exhibit A-1 at pp. 7-20; Exhibit A-2 at p. 238)  They were Colin Clarke, Marie Little, Belinda Van Horn, Augustine Solino, Theresa Cox, and Marion Hyland.  Jurors Little, Van Horn, Cox, and Hyland are female.  The prosecutor asked whether ". . . any of you ever been the victim of a crime, you or your family?"  (Exhibit A-1 at p. 55)  There was no response from anyone seated in the jury box, other than a potential juror whose name was Mr. Tjarks. (Exhibit A-1 at p. 55)

Subsequently, three additional females, Ms. Ostranga, Ms. Kennedy, and Ms. Galloway were selected.  (Exhibit A-2 at p. 238)  Ms. Galloway became the foreperson of the jury.  (Exhibit A-7 at p. 1210)  Shere claims that, because the four females who were in the jury box when the prosecutor asked the question about victims of crime were ultimately selected to serve on the jury, one of them was probably the juror

---

[9] Shere alleges no pertinent facts supporting this claim in his petition. Therefore, the second claim of juror misconduct is insufficient to warrant relief.

mentioned in the anonymous letter.  Shere contends that the unsigned letter's allusion to a female as the "chair person" tends to corroborate the fact that whoever wrote this letter was a member of the jury.

At the hearing on the motions, the trial judge concluded that the author of the letter had not served on the jury.  (Exhibit A-8 at pp. 1526-27)  However, according to Shere, the trial judge failed to explain the basis for his conclusion.

The trial judge emphasized the fact that the letter named "Judge O'Niel" as opposed to the correct "Judge McNeal."  Judge McNeal reasoned that, because he recognized the service of each juror with a certificate that bore his signature, a misunderstanding of his actual name was unlikely.  Judge McNeal concluded that the author of the letter was not a juror.  (Exhibit A-8 at p. 1526)

Shere contends that available information about the identify of the jury foreperson and a similarity (of O'Niel to McNeal) to the judge's surname warranted an interview with the jurors, because the advisory verdict in this case was only 7 to 5 in favor of the death penalty and because a juror might not retain the jury certificate to confirm the judge's name.

Ground Seven Lacks Merit

Ground seven is not a basis for habeas relief for the following, independently adequate reasons.  Although Shere raised the denial of his motion to interview jurors by direct appeal to the Florida Supreme Court, the claim in the Florida Supreme Court omitted a federal constitutional basis.  Instead, Shere claimed exclusively state law grounds.  In other words, Shere failed to "federalize" this claim in state court and,

accordingly, failed to fairly present the federal claim to the state courts.  <u>Baldwin v. Reese</u>, <u>supra</u>.  The claim is procedurally defaulted and unavailable for review by habeas corpus.

Furthermore, this claim raises no federal constitutional issue.  Shere identifies no decision of the United States Supreme Court that establishes the unfettered federal constitutional right to interview a juror.  Neither has Shere identified Supreme Court authority to support the notion, inherent in his petition, that a purely state law issue reviewed under the abuse of discretion standard in state court can be transformed into a federal constitutional claim for review by habeas corpus.

Finally, in denying relief the Florida Supreme Court stated:

> Next, we dispose of Shere's argument that the trial court erred by denying his post-trial motions for a jury interview and for a new trial related to alleged juror misconduct.  [FN17]  Shere's claims are predicated on an anonymous, typewritten letter to the editor of the St. Petersburg Times dated May 5, 1989, after Shere's trial ended.  The letter, purportedly written by a member of Shere's jury, alleges that the writer did not know Shere could have been found guilty of the lesser offense of second-degree murder; that the jury "chair person" shared the writer's lack of understanding; that the death sentence was inappropriate in light of Demo's participation and conviction of second-degree murder in a separate trial for the same offense; that two jurors failed to disclose to "Judge O'Niel" [FN18] in <u>voir dire</u> that they knew Shere; and that a juror failed to disclose in <u>voir dire</u> that her brother had been murdered a few years ago, following which the murderer was convicted, sentenced, and "out on the street" seven years later.
>
> > [FN17] Shere also argues that a new trial should be granted on the basis of a hearsay statement disclosed in a sworn affidavit executed by jail inmate Frank DeMotte.  We find no merit in this claim either on its own merits or in conjunction with the other ground we rejected above.
> >
> > [FN18] The trial judge's name was "McNeal."

- 40 -

Shere moved for a new trial pursuant to <u>Florida Rule of Criminal Procedure</u> 3.600(a)(3), which provides, in relevant part:

> (a) The court shall grant a new trial if any of the following grounds is established:
> . . . .
>
> (3) That new and material evidence, that if introduced at the trial would probably have changed the verdict or finding of the court, and the defendant could not with reasonable diligence have discovered and produced upon the trial, has been discovered.

> Shere also moved to interview the jury regarding the alleged misconduct. The trial court denied both motions.

> The letter to the editor was wholly unsupported by any sworn affidavits or other evidence; it was anonymously sent to a newspaper; it failed to name any of the jurors it accused; and there was no way the trial court reasonably could have identified the accused jurors to single them out for interviews. We conclude that the trial court did not abuse its discretion in refusing to grant the motion to interview the jury. Likewise, we find that the trial court was within its discretion to rule that the letter did not rise to the level required by rule 3.600(a)(3) to warrant a new trial.

<u>Shere v. State</u>, 579 So. 2d at 94-95. These fact findings (which Shere does not challenge) enjoy statutory deference under the AEDPA. Shere has not alleged that these findings are contrary to, or an unreasonable application of, clearly established law announced by the United States Supreme Court nor has he alleged that these findings are an unreasonable determination of the facts. This claim fails under the AEDPA.

Ground seven warrants no relief.

<u>Ground Eight</u>

THE TRIAL COURT ERRED IN DENYING MR. SHERE'S MOTION FOR NEW TRIAL BASED ON NEW EVIDENCE OBTAINED AFTER TRIAL IN VIOLATION OF THE DEFENDANT'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### Shere's Alleged Facts in Support of Ground Eight

Shere alleges that the trial court erred by denying a motion for new trial premised on supposedly "newly discovered evidence" of the alleged statement of the co-perpetrator, Bruce Demo, putatively overheard by a fellow inmate, Frank DeMotte.  The details of the proffered statement by Demo appear in an affidavit attached to the motion for a new trial.  (Exhibit A-8 at p. 1485)  In his affidavit, DeMotte recounts the details of a conversation in the Hernando County jail between Demo and another inmate, Higgins.  The conversation allegedly occurred in the early morning about four to five weeks before DeMotte signed the affidavit on May 22, 1989.  In part, Demotte's affidavit states:

> Demo was telling Higgins about shooting someone; he said that he shot [a victim] and had to finish him off because Shere was too scared to shoot him.  He also told Higgins that Shere did not know that he [that is, Demo] was going to kill the snitching [victim]. . . .  He also told Higgins that Shere was afraid and that he should have shot him too. . . .

(Exhibit A-8 at p. 1485)

Pursuant to Rule 3.600, <u>Florida Rules of Criminal Procedure</u>, Shere alleges that the affidavit qualifies as new and material evidence that potentially could alter the verdict and that was not susceptible to discovery before the trial (the statement occurred after Shere's trial but before Demo's trial).  Shere alleges that the trial court should have granted his motion for a new trial.

### Ground Eight Lacks Merit

Shere raised this claim on state law grounds in his direct appeal to the Florida Supreme Court.  As with ground seven, because Shere failed to "federalize" this claim

by timely presentation of the federal constitutional claim to Florida's courts, the claim is

procedurally defaulted.  Baldwin v. Reese, supra.

In any event, ground eight presents no federal constitutional claim.  Shere

identifies no decision of the United States Supreme Court that compels relief or stands

for the (discredited) proposition that a merely evidentiary ruling of the trial court is

reviewable in a habeas proceeding.  Jamerson v. Sec'y for the Dep't of Corr., 410 F. 3d

682, 688 (11th Cir. 2005); White v. Singletary, 70 F. 3d 1198, 1201 (11th Cir. 1995).

Similarly, Shere identifies no authority authorizing habeas review of a state court

decision resolving the credibility of a witness.

Finally, the deference standards of the AEDPA defeat this claim.  In denying

relief, the Florida Supreme Court stated:

> Next, we dispose of Shere's argument that the trial court erred by
> denying his post-trial motions for a jury interview and for a new trial related
> to alleged juror misconduct.  [FN17] . . . .
>
> > [FN17] Shere also argues that a new trial should be granted on
> > the basis of a hearsay statement disclosed in a sworn affidavit
> > executed by jail inmate Frank DeMotte.  We find no merit in
> > this claim either on its own merits or in conjunction with the
> > other ground we rejected above.

Shere v. State, 579 So. 2d at 94-95.  These state court findings, which Shere does not

challenge, warrant deference under the standards of the AEDPA.  Shere fails to allege

(and certainly fails to establish) that these findings are either contrary to, or an

unreasonable application of, clearly established precedent of the United States

Supreme Court or an unreasonable determination of the facts based upon the evidence

presented to the state courts.

- 43 -

Ground eight warrants no relief.

### Ground Nine

THE TRIAL COURT ERRED IN GIVING THE PRINCIPAL INSTRUCTION
UNDER THE FACTS OF THIS CASE IN VIOLATION OF MR. SHERE'S
RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### Shere's Alleged Facts in Support of Ground Nine

Over the objection of the defense (Exhibit A-4 at p. 744), the trial court instructed

the jury as follows:

> If two or more persons help each other commit a crime and the
> defendant is one of them, the defendant must be treated as if he had done
> all of the things that the other person or persons did if the defendant, one,
> knew what was going to happen; two, intended to participate actively or by
> sharing in an expected benefit; and three, actually did something by which
> he intended to help commit the crime.  Help means to aid, plan, or assist.
> To be a principal, the defendant does not have to be present when the
> crime is committed.

(Exhibit A-5 at pp. 834-35)  The defense objected to the so-called "principal instruction"

because the state's prosecutorial theory supposed that Shere acted alone in shooting

the victim.  Shere alleges that the trial court's instruction violated Shere's rights because

the instruction's conflict with the state's prosecutorial theory created an additional and

prejudicial factor considered by the jury against Shere.

### Ground Nine Lacks Merit

Because Shere presented ground nine on direct appeal to the Florida Supreme

Court, but only on state law grounds (Exhibit B at p. 21), the federal claim raised in the

present petition, but never fairly presented to the state courts, is procedurally defaulted.

Baldwin v. Reese, supra.

Furthermore, ground nine presents no federal constitutional claim.  The most that Shere alleges is a state law error, not cognizable in a habeas proceeding.  In any event, the record demonstrates that Shere's objection to the principal instruction assumes an interpretation of the state's prosecutorial theory. The state's evidence showed that both Demo and Shere shot the victim.  (Exhibit A-2 at pp. 255-59; Exhibit A-4 at pp. 686-700; Exhibit A-5 at pp. 782-93)  On the other hand, the defense theory designated Demo the killer and reduced Shere to mere presence at the scene, which theory required precisely the principal instruction.  (Exhibit A-2 at p. 260, 349-55; Exhibit A-4 at pp. 751-55; Exhibit A-5 at p. 805)  Under state law, the principal instruction was proper, as the Florida Supreme Court found.  <u>Shere v. State</u>, 579 So. 2d at 94.  Of course, the AEDPA governs a proceeding and defers to the state court's interpretation of state law.  Even if not procedurally defaulted, this claim is not cognizable in federal habeas.

Ground nine warrants no relief.

Ground Ten

THE TRIAL COURT ERRED IN GIVING THE SHORT-FORM "EXCUSABLE HOMICIDE" INSTRUCTION IN VIOLATION OF MR. SHERE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Shere's Alleged Facts in Support of Ground Ten

The jury instruction on excusable homicide was the short-form of that definition:

The killing of a human being is excusable and, therefore, lawful when committed by accident and misfortune in doing any lawful act by lawful means with usual, ordinary caution and without any unlawful intent, or by accident or misfortune in the heat of passion upon any sudden and sufficient provocation or upon sudden combat without any dangerous weapon being used and not done in a cruel or unusual manner."

(Exhibit A-5 at p. 828)

The defense lodged no objection to this short-form instruction and failed to request the long-form instruction.  In his statement, offered to law enforcement officers and played to the jury (Exhibit A-3 at pp. 400-48), Shere denied shooting the victim.  Therefore, Shere claims, if the guilt phase jury had considered the lesser included offense of manslaughter, this misleading short-form instruction would have precluded their "feeling that they could return a verdict of manslaughter."  Shere alleges the trial court properly instructed as to manslaughter, a lesser included offense, but by the misleading short-form, excusable homicide instruction the trial court effectively precluded the jury's considering manslaughter.[10]

<u>Ground Ten Lacks Merit</u>

Because Shere raised ground ten on direct appeal on only state law grounds, the "federalized" version of this claim in this petition has never been fairly presented to the state courts.  Accordingly, ground ten is procedurally barred.  <u>Baldwin v. Reese</u>, <u>supra</u>.

In addition, this claim presents no federal constitutional claim.  Shere has not explained how the jury instruction, which was given without objection, resulted in a constitutional violation.  Shere presents no federal claim upon which relief can be granted.

Finally, the Florida Supreme Court decided the claim on state law grounds:

Shere next raises two issues concerning the guilt-phase jury instructions.  First, Shere argues that the trial court erred by instructing the jury with the standard short-form excusable homicide instruction rather than the standard long-form instruction.  As Shere concedes, he neither objected

_____

[10] Shere offers no preferred "long-form" instruction.

to the short-form instruction, nor did he request the long-form instruction. For the reasons stated in our recent decisions in State v. Smith, 573 So. 2d 306 (Fla. 1990), and State v. Schuck, 573 So. 2d 335 (Fla. 1991), we find no merit in this claim.

Shere v. State, 579 So. 2d at 94.[11]  Shere has not argued that the decision of the Florida Supreme Court is contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  Shere's claim fails under the AEDPA.

Ground Ten warrants no relief.

### Ground Eleven

THE TRIAL COURT ERRED IN DENYING MR. SHERE'S MOTION TO SUPPRESS IN VIOLATION OF MR. SHERE'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Shere filed an amended motion to suppress Shere's statements to law enforcement.  (Exhibit A-6 at p. 1153-55)  At the state court pre-trial hearing on the amended motion to suppress, Detective Arick testified to the facts surrounding Shere's statements.  (Exhibit A-9 at p. 1576)

Shere alleges that he appeared at the Hernando County Courthouse on January 13, 1988, in connection with a separate case, Case Number 87-455-CF. (Exhibit A-6 at p. 1153)  Before this meeting, Detective Arick had obtained a search warrant for Shere's vehicle and a warrant for Shere's arrest, both based on an "off-bond"

---

[11] In Banda v. State, 536 So. 2d 221 (Fla. 1989), the Florida Supreme Court held that an error in the manslaughter instruction is not a basis to reverse a conviction for first degree murder because it is two steps removed from the conviction and harmless error at best if, as in Shere's case, no evidence supports the defenses of excusable or justifiable homicide. See also, Squires v. State, 450 So. 2d 208 (Fla.), cert. denied, 469 892 (1984).  Shere's defense was that Demo committed the crime, not that the murder was excusable or justifiable.  Shere lacks any pretense of self-defense or other justification for Snyder's murder.

order signed the same day, January 13, 1988.  (Exhibit A-9 at 1582-83)  Detective Arick

and two other officers spoke with Shere outside the courtroom and asked Shere if he

would talk with them, to which Shere agreed.  Shere conversed with the officers at the

Hernando County Sheriff's Department.  During the conversation, Shere denied

knowledge of Snyder's disappearance before declining to answer further questions.

(Exhibit A-9 at pp. 1583-86)  After invoking his right to remain silent, Shere was arrested

on the "off-bond" warrant in the unrelated case and housed in the Hernando County

jail.[12]

　　　During this initial meeting, the officers told Shere that cooperation was in his best

interest.  (Exhibit A-9 at p. 1605)  On the next day, January 14, 1988, at about

12:25 p.m., Detective Arick and Detective Blade went to the Hernando County jail to talk

again with Shere.  Shere agreed to show the detectives where the shooting occurred.

Later the same day Shere taped a statement.  (Exhibit A-9 at pp. 1590-95), which was

later admitted into evidence and played for the jury.  (Exhibit A at pp. 400-48)

　　　According to Shere, at the time he taped his statement he had previously invoked

his right to silence, and he had been advised by law enforcement officers that

cooperation was in his best interest and that lack of cooperation was irreversibly

contrary to his best interest.  (Exhibit A-9 at p. 1605)  Shere remained without counsel,

had not appeared before a judge subsequent to his arrest on the "off-bond" warrant, and

was interviewed in jail after a law enforcement officer told Shere that Demo accused

Shere of Snyder's murder.  (Exhibit A-9 at p. 1603)  Shere's counsel claimed that first

---

[12]  Shere remained in the jail without bond on the charges in the unrelated case.  Shere had
no counsel at that time.

appearances for other defendants in unrelated cases occurred at 8:00 a.m. on

January 14, 1988.  (Exhibit A-9 at pp. 1606-07)  As he argued at the hearing on his

motion to suppress (Exhibit A-9 at pp. 1605-22), Shere alleges that, given the totality of

the circumstances, any statement was involuntary and warranted suppression.

<u>Ground Eleven Lacks Merit</u>

Shere raised ground eleven on direct appeal.  The Florida Supreme Court

affirmed the denial of the suppression motion and stated:

> Shere next argues that the trial court erred in denying the motion to suppress his statements to detectives.  The record shows that detectives first approached Shere on January 13, 1988.  They took him to the sheriff's office where he waived his <u>Miranda</u> rights, made no inculpatory admissions, and invoked his right to silence.  Detectives immediately ceased the interrogation and incarcerated Shere.  The next day, detectives advised Shere that Demo had implicated him in Snyder's murder.  Shere again waived his <u>Miranda</u> rights in accord with <u>Michigan v. Mosley</u>, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), this time inculpating himself in a detailed series of statements about the killing.  Shere argues that his inculpatory statements were not voluntary when considered in the totality of the circumstances.  Specifically Shere makes reference to the fact he previously had invoked his right to silence; that detectives advised him it would be better to cooperate, and that it would be bad or irreversible if he did not; that he made the statements without benefit of counsel; that he had not been taken before a judge; that the second interrogation took place in jail; and that he had been told by a law enforcement officer that Demo implicated Shere as the murderer.
>
> We find no evidence in the record to support Shere's claim that either any single act by detectives, or the totality of the circumstances, compelled him to make involuntary statements in violation of his fifth amendment rights.  The trial court found that Shere had been advised of his rights and waived them in accordance with <u>Miranda</u> and <u>Mosley</u>.  We find no abuse of discretion.

<u>Shere v. State</u>, 579 So. 2d at 90.  The Florida Supreme Court's findings are neither

contrary to, nor an unreasonable application of, clearly established federal law.  Further,

the court's decision did not result from an unreasonable determination of the facts in light of the evidence presented.

The evidence from the suppression hearing consisted of the testimony of one law enforcement officer.  Shere stipulated both that he was not represented by counsel when first in contact with law enforcement and that the second officer, if called, would testify consistent with the first officer.  (Exhibit A-9 at p. 1575)  (Because Shere never invoked his right to counsel, no Sixth Amendment issue appears.)  Uncontradicted testimony at the suppression hearing establishes that the police honored Shere's initial request to stop questioning and that, when confronted with statements from his girlfriend and co-defendant, Shere stated, "Yes.  I've been thinking about it and I want to talk to you.  I wanted to get in touch with you but they took your cards away from me so I couldn't call you."  (Exhibit A-9 at pp. 1590, 1603)  After law enforcement again advised him of his <u>Miranda</u> rights, Shere gave an incriminating statement.  Shere later took law enforcement to both the scene of the murder and the burial location.  Shere also located for law enforcement other physical evidence, such as the burned back seat of his car and the springs from the car.  (Exhibit A-9 at pp. 1591-95)  The evidence uniformly supports the voluntariness of Shere's statement.  The Florida Supreme Court properly upheld the denial of the amended motion to suppress.

Ground Eleven warrants no relief.

Ground Twelve

THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE
PHOTOGRAPHS OF THE VICTIM'S BODY IN VIOLATION OF MR.
SHERE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Shere's Alleged Facts in Support of Ground Twelve

The trial court allowed into evidence as state's Exhibit 1 (Exhibit A-2 at p. 289) a photograph of the victim's body.  Objecting to the photograph, the defense argued that the prejudicial value exceeded any probative value.  In response, the state provided no countervailing argument or justification for offering the photograph.  Nonetheless, the trial court received the photograph into evidence.  Shere alleges that the sole purpose of the photograph was impermissibly to inflame the jury.

Ground Twelve Lacks Merit

Shere raised this claim on direct appeal to the Florida Supreme Court. Apparently, the basis for Shere's claim is that "no suggestion was made by the prosecutor as to any relevance of the photograph."

However, the Florida Supreme Court found "no abuse of discretion in the trial court's denial of a motion to exclude a photograph of the victim's body.  See, e.g., Jackson v. State, 545 So. 2d 260, 265 (Fla. 1987)."  Shere v. State, 579 So. 2d at 89 n.8.  Ground twelve is not a basis for relief for the following reasons.

First, Shere failed to raise the federal basis for this claim in his brief to the Florida Supreme Court on direct appeal.  Instead, Shere argued for reversal solely on state law grounds.  Therefore, this federal claim, never presented to the state courts, is procedurally defaulted.  Baldwin v. Reese, supra.

Second, the claim presents no federal constitutional claim for relief.  Instead, admission into evidence of a photograph is purely a matter of state evidentiary law, which is not properly the subject of habeas review.  Jamerson v. Sec'y for the Dep't of

Corr., 410 F. 3d 682, 688 (11th Cir. 2005); White v. Singletary, 70 F. 3d 1198, 1201

(11th Cir. 1995).

Third, by denying this claim, the Florida Supreme Court reached no result that is

contrary to, or an unreasonable application of, clearly established federal law.  Shere

has identified no clearly established federal law that is inconsistent with the result

reached by the Florida courts.  Accordingly, this claim fails under the AEDPA.

Ground Twelve warrants no relief.

Ground Thirteen

THE TRIAL COURT ERRED IN DENYING MR. SHERE'S MOTION FOR
MISTRIAL AS TO INFERENCES BY THE STATE OF OTHER,
UNRELATED CRIMINAL CHARGES AGAINST MR. SHERE IN
VIOLATION OF MR. SHERE'S RIGHTS UNDER THE FIFTH, SIXTH,
EIGHT, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

Shere's Alleged Facts in Support of Ground Thirteen

Shere was contacted initially by law enforcement in regard to this case while at

the Hernando County Courthouse on January 13, 1988, for a court appearance on

another criminal charge.  To prevent the jury's prejudicial inference of the existence of

other criminal charges, the defense successfully moved pre-trial to prevent mention

before the jury of Shere's presence at the courthouse.  (Exhibit A-3 at p. 399)  However,

according to Shere, the prosecutor persisted in "getting that improper information in

front of the jury."

During the prosecutor's questioning of Detective Arick, this exchange occurred:

BY THE PROSECUTOR:

- 52 -

> Q. Would you describe for the ladies and gentlemen of the jury how it was you came into contact with him on that date?
>
> A. Well, early on in the investigation through talking with a couple of other witnesses, he had been developed as a suspect.  And we had also received information that he might be at the county courthouse
>
> [DEFENSE ATTORNEY]:  Objection, Your Honor.
>
> THE COURT:  Objection sustained.
>
> BY THE PROSECUTOR:
>
> Q. All right.  Were you able to locate him on the 13th?
>
> A. Yes.
>
> Q. And where was it that he was located?
>
> A. At the courthouse.
>
> [DEFENSE ATTORNEY]:  Objection, Your Honor.
>
> THE COURT:  Objection sustained.
>
> [DEFENSE ATTORNEY]:  I have a motion to make.
>
> THE COURT:  I'll let you reserve any motion that you would normally make at this time.
>
> [DEFENSE ATTORNEY]:  Thank you. Your Honor.

(Exhibit A-2 at pp. 339-40)  Shere alleges that this exchange created a prejudicial inference that additional criminal charges pended against Shere.

Anticipating Shere's motion for a mistrial on this issue, the trial court allowed the defense to reserve the argument.  (Exhibit A-2 at p. 340)  Defense counsel later moved for a mistrial, which motion was denied.  (Exhibit A-3 at p. 399)

Shere alleges "that it is clearly accepted law that it is improper to present evidence tending to show that a defendant has committed other crimes unless such is to be admitted under the <u>Williams</u> Rule theory."[13]   Shere contends that in view of the prosecution's disregard of the court's ruling the motion for mistrial should have been granted.[14]

Shere claims that, although sustaining the defense's objection to this testimony, the trial court's refusal to grant Shere's motion for a mistrial violated Shere's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

<u>Ground Thirteen Lacks Merit</u>

Shere failed to raise ground thirteen on a federal constitutional basis during his direct appeal to the Florida Supreme Court.  Therefore, never fairly presented to the state courts, the constitutional claim is procedurally defaulted.  <u>Baldwin v. Reese</u>, <u>supra</u>. In any event, ground thirteen states no violation of federal law and utterly fails to implicate the United States Constitution.

Finally, even if not procedurally defaulted, this claim was correctly decided by the Florida Supreme Court on the basis of state law and in a decision that is neither contrary

---

[13] Based on <u>Williams v. State</u>, 110 So. 2d 654 (Fla. 1959), <u>cert.</u> <u>denied</u>, 361 U.S. 847 (1959), Florida's <u>Williams</u> Rule is codified at Section 90.404(2)(a), <u>Florida</u> <u>Statutes</u>:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

[14] The <u>Williams</u> Rule Notice of Intent To Offer Evidence of Other Crimes related to a 1986 theft  while Shere was armed with a shotgun, in violation of Florida Statute 810.02. (Exhibit A-6, p. 1060).

to, nor an unreasonable application of, clearly established federal law and that is not

unreasonable in light of the facts.  The Florida Supreme Court held:

> First, Shere claims that the trial court erred in denying his motion for
> mistrial because the state implied that Shere was facing other, unrelated
> criminal charges.  Before trial, the court granted Shere's motion to bar the
> state from presenting evidence that detectives first contacted Shere at a
> courthouse where Shere appeared on other criminal charges.  Despite that
> order, the prosecutor adduced testimony from Detective Arick that he
> located Shere "at the courthouse."  However, the jury heard nothing to
> suggest that Shere's presence "at the courthouse" related to any other
> criminal charges against him.  Shere objected and moved for a mistrial.
> The trial court sustained the objection but denied the motion for a mistrial.
> We conclude that although the prosecutor's endeavor to elicit that testimony
> despite the court's prior order may be questionable, there was no abuse of
> discretion by the trial court under these circumstances.

Shere v. State, 579 So. 2d at 89-90.  These findings are presumptively correct, entirely

reasonable, and entitled to deference.

Ground Thirteen warrants no relief.

## Ground Fourteen

MR. SHERE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL
AT THE PENALTY PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION BY THE FAILURE OF DEFENSE COUNSEL TO
PRESENT PROPER AND ADEQUATE MENTAL HEALTH EVIDENCE
THROUGH THE USE OF EXPERTS FULLY PREPARED FOR OFFERING
MITIGATION IN THE PENALTY PHASE OF THE TRIAL.

### Shere's Alleged Facts in Support of Ground Fourteen

The evidence shows that defense counsel Genie Buckingham Toner learned from

Shere's family that Shere had suffered a serious head injury as a child and that the

injury had caused Shere to suffer frequent headaches.  As the defense counsel

preparing for the penalty phase of the trial, Buckingham Toner informed Dr. Fisher, a

potential defense expert, who conjectured that Shere might suffer from a manic disorder and who requested counsel's assistance in inquiring further with Shere's family. Buckingham Toner claimed that she neither discussed symptoms with Shere's family nor pursued the matter further with Dr. Fisher or another expert.  Shere alleges that Buckingham Toner knew of the childhood head injury but declined to pursue further neurological testing to determine whether Shere had residual brain damage.

At the evidentiary hearing, Dr. James Larson emphasized the advisability of obtaining neurological or neuropsychological testing.  However, Shere alleges that Buckingham Toner independently rejected the advice of the medical experts because testing endangered Buckingham Toner's primary and secondary defense theory that Demo manipulated Shere when Shere was abusing alcohol and drugs.

Ground Fourteen Lacks Merit

In his Rule 3.850 motion for post-conviction relief, Shere raised ground fourteen, which alleges that his trial counsel was constitutionally ineffective at the penalty phase of his capital trial because counsel failed to present "proper and adequate mental health evidence."  After an evidentiary hearing, the court denied relief and the Florida Supreme Court affirmed:

> Shere alleges that defense counsel was deficient in failing to call Dr. Fisher to testify during the penalty phase as to the possibility of Shere suffering from manic disorder or the possibility of organic brain damage evidenced by headaches he complained of as a result of a childhood head injury.  [FN12]  At the hearing, Ms. Buckingham Toner, the attorney responsible for the penalty phase of the trial, testified that she had found out about Shere's childhood head injury and subsequent headaches when she interviewed his family members in preparation for the penalty phase and in turn told Dr. Fisher about it.  [FN13]  Dr. Fisher told Ms. Buckingham Toner about the possibility of manic disorder and informed her about the

symptoms to look for as she further interviewed members of Shere's family. However, she testified that the family members discussed no symptoms evidencing the possibility of manic disorder.

[FN12] Shere's remaining claims on this issue are clearly without merit or procedurally barred. Shere also alleges that trial counsel was ineffective because through greater due diligence, counsel could have established that the CCP aggravator was not established beyond a reasonable doubt. However, Shere does not allege the due diligence through which counsel could have proved this. In fact, the only allegation made by Shere on this issue is that the trial court erred in finding that Shere and his accomplice had planned the murder several hours before the actual killing. Moreover, the evidence found by the trial judge at the hearing is part of the same evidence that this Court relied on to uphold the CCP finding on Shere's direct appeal. Shere is clearly attempting to relitigate the merits of the CCP finding by couching it in terms of an ineffective assistance of counsel claim. See Medina v. State, 573 So. 2d 293, 295 (Fla. 1990) (stating that claims of ineffective assistance of counsel should not be used to circumvent the rule that post-conviction proceedings cannot serve as a second appeal). Therefore, this claim is insufficiently pled and, in the alternative, without merit.

Shere also argues that counsel failed to present and argue the following nonstatutory mitigators: (1) Shere's cooperation with authorities; (2) Shere's abandonment of the crime as established by his requests to take the victim to the hospital; (3) Shere's passivity; and (4) his efforts to dissuade Demo from his homicidal desire. This claim also appears to be procedurally barred because it was not raised in the 3.850 motion. See Doyle, 526 So. 2d at 911. Nevertheless, it appears that this claim would not satisfy the two-prong test enunciated in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Although Shere did assist the police by leading them to the victim's body and the crime scene, Shere had previously denied having any knowledge or involvement with the crime. Moreover, the only evidence of his abandonment of the crime and efforts to take the victim to the hospital and dissuade Demo from committing the murder is through his own self-serving statements. Assuming that defense counsel was deficient in not presenting this evidence, we find that such nonstatutory mitigating

evidence would not have materially affected the jury's recommendation.

[FN13] We recognize that Ms. Buckingham Toner had never before tried a first-degree murder case.  However, although we can and should consider this as a factor in the effectiveness of counsel's representation, we have rejected treating it as a presumption of ineffectiveness.  See Remeta v. Dugger, 622 So. 2d 452, 454 (Fla. 1993).

She [Attorney Buckingham Toner] further testified that manic syndrome was not the primary theory she was trying to develop in the penalty phase. Instead, she was trying to portray Shere as a follower and not a leader, as a good child, and as a person who had experienced great emotional problems as a result of his parents' divorce.  She was also trying to show his drug and alcohol abuse.  Moreover, she testified she thought her credibility before the jury would be tainted if she argued Shere's headaches to the jury as mitigators, headaches that had allegedly stopped after Shere had moved many years before to Hernando County.  She further stated that it was not a mistake not to present Shere's head injury.  On cross-examination, she stated that if the headaches had continued after he moved to Hernando County, she might have been more likely to present the headaches as a theory of mitigation because they could be more easily believed to have been the result of his head injury rather then the result of emotional problems.  At the evidentiary hearing, Shere presented Dr. James Larson, who testified that, based on the evidence before him then, it would have been prudent to have ordered neuropsychological testing for Shere.

In its order rejecting the claim of ineffectiveness for not investigating or developing further mental mitigation, the trial court stated:

The defendant urges the court to find that trial counsel was given evidence of defendant's "severe head injury as a youth and his subsequent headaches" (defendant's proposed order on R. 3.850 hearing) and even though they had that evidence, failed to request a neuro-psychological or neurological exam by a qualified expert and further investigate the case.  That claim is not supported by the evidence.

The defendant did not report any head injuries that resulted in unconsciousness to his attorneys or to Dr. Fisher that would have alerted them to make further investigation. Even in his interview with Dr. Larson, the defendant did not

report any loss of consciousness.  It is inconceivable that defendant would not know this fact.

The need for further evaluation rests solely on the accuracy of new evidence from defendant's family that he fell from the top of a 30 foot backstop and was knocked unconscious.  The court did not give that evidence any credibility because the defendant's description of the event is substantially different.  Also, the timing of this report and the lack of any supporting medical records are additionally [sic] evidence that the report is not completely true.

The defendant's general claims that he was denied effective assistance of counsel in the penalty phase of the trial are not supported by the evidence.  The defendant's trial attorneys tried to develop statutory and non-statutory mitigating circumstances by diligently investigating the defendant's background.  Based on what they were told by the defendant and his sister they developed a theme that the defendant was a kind, gentle, God-fearing man, who suffered emotionally as a result of his parents' divorce and who was a follower by nature.  They presented that evidence to the jury.  The fact that the jury, and this court, failed to find that evidence of sufficient weight to recommend a life sentence does not establish that the defendant's trial counsel were ineffective.  The evidentiary hearing testimony of the defendant's mother, father, and sister was not materially different than the evidence of mitigation presented to the jury.  Also, their testimony that the defendant was a chronic drug and alcohol abuser is, if true, less mitigating than the evidence presented to the jury and contrary to the defendant's own statements that neither drugs, nor alcohol played any part in the offense.  More importantly, the new version of events offered by the family would not have caused the jury to change its recommendation or this Court to change its sentence.

Order at 22-24.  We find that the trial judge's factual findings are supported by competent substantial evidence.  Further, we note that, unlike most cases where we have held trial counsel ineffective for failing to investigate and present mitigating evidence, Shere has provided no new expert who can testify directly on the issue of the alleged mental conditions suffered by him that would support mitigating circumstances.  See, e.g., Rose, 675 So. 2d at 571.  In fact, even though the new expert, Dr. Larson, testified at the hearing that it was possible that statutory mitigating circumstances existed,

the trial court found that he could not specifically address any mitigating circumstances or establish a basis for his opinion. Thus, we conclude that the trial court's legal conclusions are supported by our prior opinions. <u>See</u>, <u>e.g.</u>, <u>Rutherford v. State</u>, 727 So. 2d 216, 223-25 (Fla.1998); <u>Haliburton v. Singletary</u>, 691 So. 2d 466, 471 (Fla. 1997).

<u>Shere v. State</u>, 742 So. 2d at 222-24. These findings by the state courts are neither contrary to, nor an unreasonable application of, clearly established federal law. Similarly, those findings are not an unreasonable interpretation of the facts in light of the evidence presented. Shere has not carried his burden of proof under the AEDPA, and is entitled to no relief.

Ground fourteen warrants no relief.

### Ground Fifteen

THE TRIAL COURT ERRED IN CALLING MR. SHERE'S WIFE TO TESTIFY AS A COURT WITNESS WHICH PERMITTED THE INTRODUCTION OF INADMISSABLE EVIDENCE THROUGH IMPROPER CROSS-EXAMINATION AND IMPEACHMENT BY THE STATE IN VIOLATION OF MR. SHERE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

#### Shere's Alleged Facts in Support of Ground Fifteen

Based on what the state represented were inconsistent statements before trial and based on prospective hostility, the state sought to call Heidi Greulich as the court's witness. (Exhibit A-4 at pp. 606-12) The defense objected, claiming an insufficient demonstration by the state that Greulich was either evasive or untruthful. (Exhibit A-4 at p. 609) Overruling the objection, the trial court called Greulich as the court's witness. (Exhibit A-4 at p. 619) Shere alleges the predicate was insufficient to warrant the state's

examining Greulich as the court's witness under Section 90.615, Florida Statutes

(1987).

Shere alleges that, after the trial court summoned Greulich as the court's witness,

the state "cross-examined" Greulich and otherwise elicited inadmissible and especially

harmful information about Shere.

<u>Greulich's Appearance at Trial</u>

Greulich was called under Section 90.615(1), Florida Statutes (1987), as the

court's witness in the guilt phase of the trial after the state asserted an inability to vouch

for her credibility because of allegedly inconsistent prior statements.  Without an inquiry

or a finding of fact concerning prior statements or credibility, the trial court called

Greulich as the court's witness and allowed the parties to cross-examine her.

Over defense objections, the state's cross-examination focused on Greulich's

prior statements describing Shere's actions and statements both before and after

Snyder's murder.  The state repeatedly sought to impeach Greulich whenever Greulich

claimed to forget.  For example, the prosecutor asked Greulich if she remembered the

telephone conversation between Shere and Demo:

> Answer [Greulich]:  I heard bits and pieces of things, I really could not
> recall right now.

> Question [Prosecutor]:  You heard him say,"I can't believe Drew
> would turn state's evidence against me, but it seems right
> because he hadn't been arrested on any charge," and he thinks
> maybe Drew turned Brewster in for something, too.  You heard
> him say that?

> Answer:  I cannot recall at this time. It may be possible.

Question: Ma'am, do you recall giving a statement to Alan Arick and
James Blade of the Hernando County Sheriff's office on
January 15, 1988?

Answer: Yes, I do.

Question: You recall Detective Blade asking you what was--what did
the conversation about Drew--what did you hear, and you
repeated the words I just read to you?

Answer: That could be.  I have not looked over the depositions.
None were given to me.

Question: Would you doubt that's what it says?  Would you like to
look at it?

Answer: No, thank you.

(Exhibit A-4 at pp. 705-06)

Shere alleges that the prosecution's examination implemented a strategy to elicit

otherwise inadmissable out-of-court statements as substantive evidence against Shere.

Shere also alleges that the trial court erred in calling Greulich as the court's witness

based only on the allegation of hostility but absent a showing of lack of credibility.

Shere claims this alleged error deprived Shere of rights under the Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.

## Ground Fifteen Lacks Merit

Although asserting only state law objections, Shere raised ground fifteen on direct

appeal.  The Florida Supreme Court rejected the claim.  Because Shere omitted the

constitutional claim during direct appeal and consequently never "fairly presented" the

claim to the state courts, Shere procedurally defaulted this claim.  Baldwin v. Reese,

supra.

Alternatively and secondarily, the claim presents only a putative state law error, and state law claims are not cognizable in federal habeas.  But, even assuming this evidentiary error is cognizable in this proceeding, Shere nonetheless fails to demonstrate that the putative error had a "substantial and injurious effect" on the proceedings.  Relying exclusively on Florida law, the Florida Supreme Court found the claimed error harmless beyond a reasonable doubt:

> In Shere's final evidentiary claim, he contends that the trial court erred by calling Greulich to testify as a court witness pursuant to section 90.615(1) of the <u>Florida Statutes</u> (1987).  [FN9]  We agree that the trial court abused its discretion, thereby permitting the state to introduce inadmissible evidence through improper cross-examination and impeachment.  However, under the circumstances of this case, we find the error to be <u>harmless</u>.  The evidence against Shere came largely from his own mouth, including his self-incriminating statements and the physical evidence which those statements helped to identify.  The jury viewed evidence of the crime scene that was produced directly because of Shere's cooperation with investigators.  Demo's statement and Pruden's testimony were very damaging.  Moreover, portions of Greulich's incriminating testimony would have been admissible anyway had the error not been committed.  Thus, the quality and quantum of incriminating evidence properly admitted at trial compel us to conclude beyond a reasonable doubt that there is no reasonable possibility that erroneously calling Greulich as a court witness and admitting her prior statement contributed to the verdict.  <u>See</u> <u>State v. DiGuilio</u>, 491 So. 2d 1129 (Fla. 1986).

<u>Shere</u>, 579 So. 2d at 90.  (emphasis added)

Florida follows the harmless error standard adopted in <u>Chapman v. California</u>, 386 U.S. 18 (1967).  <u>See</u> <u>Smith v. State</u>, 762 So. 2d 969, 970 (Fla. 2000) (citing <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967); <u>Goodwin v. State</u>, 751 So. 2d 537, 546 (Fla. 1999); <u>State v. Lee</u>, 531 So. 2d 133, 136 n.1 (Fla. 1988); <u>State v. Dodgily</u>, 491 So. 2d. 1129, 1135 (Fla. 1986)).  Therefore, under Florida law "[T]he harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable

doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." Goodwin v. State, 751 So. 2d at 540 (citing Chapman, 386 U.S. at 24).

However, the test for constitutional error in federal habeas proceedings is "whether the error had substantial and injurious effect or influence in determining the jury's verdict.  Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Even assuming that ground fifteen states a federal constitutional claim, the result reached by the Florida courts, coupled with a Brecht analysis, confirms that any constitutional error was harmless.  The Florida Supreme Court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law.  Similarly, the state court result is not an unreasonable interpretation of the facts.  The AEDPA includes no basis for relief.

Ground fifteen warrants no relief.

Ground Sixteen

MR. SHERE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN DEFENSE COUNSEL CALLED DETECTIVE ARICK AS A DEFENSE WITNESS WHICH PERMITTED THE STATE TO INTRODUCE STATEMENTS OF BRUCE DEMO.

Shere's Alleged Facts in Support of Ground Sixteen

Defense counsel called Detective Arick as a witness during the guilt phase of Shere's trial.  The detective's testimony "opened the door" for the state to cross-examine the detective regarding Demo's statements about Snyder's murder.

Shere alleges that at the end of the case-in-chief the state had not contradicted Shere's statements about events the night of the murder, including, in particular, Shere's statement to law enforcement that Demo shot Snyder and Shere's statement that his fear of Demo lent force to Demo's threats, including the threat of danger to his girlfriend, Heidi Greulich.  According to Shere, the defense's calling Detective Arick to testify, despite the opportunity to rest without calling a witness, triggered Demo's contradictory statements and "destroyed the ability of the defense to focus on the weaknesses of the state's case."

Ground Sixteen Lacks Merit

Although unsuccessful, Shere raised ground sixteen in his Rule 3.850 motion. After an evidentiary hearing on this claim, the trial court entered an order stating:

> The defendant claims that his attorneys were ineffective for introducing the codefendant's statements to law enforcement in the guilt phase of the case.  The defendant urges the court to find that counsel introduced the codefendant's statements "without a reasonable or plausible strategic purpose."
>
> The record of the trial and the testimony presented during the evidentiary hearing clearly establish that the decision to offer evidence of the codefendant's admissions regarding his own involvement in the murder was a tactical judgment on the part of the defendant's trial counsel.  At the conclusion of the State's case, the defendant was in a desperate situation. Although the defendant blamed the murder on his codefendant in his statement to law enforcement, the State also introduced evidence at trial that the defendant gave several inconsistent statements after his arrest. (R. 336-455).  The State also established that the defendant told his girlfriend that he had killed the victim himself, (R. 714-17) and that he had

- 65 -

told a friend, Ray Pruden, that he had shot the victim "ten or fifteen times," that he had buried the victim "where nobody would find him," and that the defendant had made no mention of any involvement by the codefendant. (R. 739).  The physical evidence, including projectiles removed from the victim's body that came from defendant's gun, was extremely damaging.  The state's case-in-chief did not leave any doubt that the defendant played a leading role in the murder and subsequent coverup.  It is likely that nothing the defendant or his attorneys could have done at that point would have avoided a conviction for first degree murder.  They had a choice of resting and reserving their right to opening and closing final arguments, or of mounting some kind of defense, weak as it was.  Other than the order of final arguments, defendant did not have anything to lose.

If counsel had made a careless or unconcerned decision to [ ] introduce the evidence, the court would be concerned.  See e.g.,Clark v. State, 690 So. 2d 1280 (Fla. 1997) (counsel's arguments to the jury assisted the prosecution's case and encouraged the jury to impose the death penalty).  The court would also be concerned if the decision was made by an uninformed and inexperienced attorney.  However, defendant was represented by a highly competent and ethical trial attorney who has dedicated his life to defending people who are charged with crimes.  He was assisted in trial by an excellent associate.  He had the benefit of advice from a highly experienced investigator and experienced attorneys working in his own office.  They had the assistance of a reliable mental health professional that his office uses in many cases.  They investigated every avenue of defense and mitigation suggested by the evidence and all information they were furnished by the defendant, his family, his wife, and the psychologist.

Counsel made the tactical decision after considering all of the evidence against his client and considering all other alternatives.  See State v. Bolender, 503 So. 2d 1247, 1250 (Fla. 1987), cert. denied, 484 U.S. 873 (1987).  ("Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected.").  Although this strategy may appear futile, this court has seen weaker arguments prevail in front of a jury of untrained citizens.  Finally, the fact that introducing portions of the codefendant's statement opened the door to other inculpatory evidence was not of much consequence given the fact that the defendant's statements to law enforcement and his friends were already before the jury and those statements portrayed him as a cold and ruthless killer.

The court finds that the defense attorney's decision to introduce the codefendant's statements was not 'a clear, substantial deficiency' that was

"outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell, 490 So. 2d at 932.  The codefendant's statement confirmed that he fired the fatal shot and that the defendant did not act alone.  The defense believed these facts would mitigate against a conviction of first degree murder, and more importantly, against a recommendation of death.  Also, no matter how the defendant or his attorneys tried to rationalize his involvement in the crime, there was overwhelming evidence that the defendant was guilty of first degree murder.  The defendant did not prove that his attorneys' strategy prejudiced the outcome of the trial or that it "so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." Maxwell, 490 So. 2d at 932.

(Order Denying Defendant's Motion for Post-Conviction Relief, Exhibit G-15,

R. 2650-52)  On appeal of the denial of Rule 3.850 relief, the Florida Supreme Court

affirmed, citing verbatim to the trial court's order denying relief. Shere, 742 So. 2d at

219-20.

The Florida Supreme Court further stated:

At the evidentiary hearing, defense counsel testified concerning his decision to call Detective Arick as a witness:  "No, it was not a mistake.  It may have turned out to be a mistake, but at the time of trial, I thought it was right."  This testimony is important because [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Strickland, 466 U.S. at 689 (citation omitted); see also Cherry v. State, 659 So. 2d 1069, 1073 (Fla. 1995) (concluding standard is not how current counsel would have proceeded in hindsight).  Moreover, as referenced by the trial court, defense counsel specifically testified that although he consciously recognized Demo's statements were a double-edged sword, he believed that Demo's statement confessing to firing the fatal shot and confirming that Shere did not act alone would mitigate against a conviction of first-degree murder and a recommendation of death in Shere's case.

Shere also argues that counsel's decision prejudiced him because it damaged his credibility before the trial judge and the jury. However, the record, and in particular Detective Arick's testimony on direct examination as a state witness, show that counsel was handicapped by the fact that Shere had completely changed his story. When first questioned by police, Shere said that he knew nothing about the murder. Upon further questioning, however, he testified to the accounts of what had transpired and led police to the buried body and the weapon used in the murder. As such, his credibility before the judge and jury had already been damaged. Therefore, we conclude that the trial court's factual findings and legal conclusion that counsel's decision was a tactical one that did not constitute ineffective assistance of counsel does not constitute reversible error.

Shere v. State, 742 So. 2d at 221. The findings of the Florida Supreme Court are neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court law. Similarly, those findings are not unreasonable in light of the facts elicited at the evidentiary hearing. Shere fails to carry his burden under the AEDPA.

Ground Sixteen warrants no relief.

### Ground Seventeen

MR. SHERE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO DEFENSE COUNSEL['S] FAILURE TO PROPERLY ADVISE THE DEFENDANT REGARDING HIS CONSTITUTIONAL RIGHT TO TAKE THE STAND AND TESTIFY IN HIS OWN DEFENSE.

At the conclusion of the penalty phase of the trial and after the jury voted seven to five to recommend a sentence of death, Shere addressed the court and contended that he was not afforded the opportunity "by his counsel" to testify in the guilt phase of the trial. When the court inquired whether he discussed his testifying with his counsel, Shere responded, "I was never given the opportunity, I don't believe. . . ." (Exhibit A-5 at p. 991) Shere alleges that his failure to testify at the guilt phase of the trial prevented

the defense's supplying the jury additional information about the relative culpability of

each participant in Snyder's murder.

At the evidentiary hearing, defense counsel testified to her concern that Shere did

not understand the decision of whether to testify.

<u>Ground Seventeen Lacks Merit</u>

Shere alleges that he raised this "right to testify" claim in his Rule 3.850 motion.

To the extent that the present claim is the same claim that Shere raised in his state

motion for post-conviction relief, the Florida Supreme Court rejected the claim as

follows:

> Shere also argues that defense counsel was deficient in failing to act as an advocate.  Except for Shere's claim that defense counsel pressured him into deciding not to testify, the remaining claims raised under this heading are procedurally barred because they were raised for the first time on appeal.  <u>See</u> <u>Doyle</u>, 526 So. 2d at 911.  [FN11]  Again, the trial court comprehensively dealt with Shere's claim in its order:

>> [FN11] These claims include assertions that defense counsel had disdain for Shere and that he had testified that Shere was a liar and that the evidence at the close of the State's case indicated that Shere had committed the murder.  Moreover, Shere alleges that defense counsel abrogated his duty by shifting the burden of picking the jurors in the case to Shere.

> Defendant's trial attorneys testified that they allowed the defendant to make the final decision on whether he should testify in the guilt stage of the trial.  They counseled with him on this issue on many occasions, even arranging a mock direct and cross examination to illustrate the problems with his testimony.  The defendant was an erratic and difficult client who insisted on repeatedly changing his version of the murder.  He even told Dr. James Larson, the expert he retained for the R. 3.850 proceedings, different versions of what happened that evening.  His attorneys, their investigator, and the Chief Assistant Public Defender advised the defendant against testifying.  That advice was a reasonable, tactical decision that was in the realm of counsel's professional judgement--not ineffective assistance of counsel.

- 69 -

Before the defense rested, the attorneys consulted with the defendant again and advised him that the time had come to decide whether to testify.  He agreed that he would not.  As a result of the defendant's comments to this court at the conclusion of the penalty phase of the trial, both of defendant's attorneys prepared written memoranda of law concerning the details of their discussion with the defendant regarding the issue of the defendant testifying during the guilt phase of the trial.  The documents, prepared shortly after trial, are consistent with each other and the attorneys' testimony in the R. 3.850 hearing.  The defendant's testimony during the R. 3.850 hearing was not credible.  Furthermore, he did not present any specific evidence or argument to show how his testimony in the guilt phase would have improved his chances of being found not guilty of first-degree murder.

Order at 7-8.[15]

As further proof that defense counsel was deficient in this regard, Shere points out that defense counsel testified at the evidentiary hearing that Shere did not understand the decision of whether or not to testify.  However, this statement was made by co-counsel, Ms. Buckingham Toner, the attorney who sat as second chair during the trial, and must be examined in the broader context of her entire testimony.  Immediately before the cited statement, Ms. Buckingham Toner testified that she thought Shere understood he had a right to testify or not testify, but obviously he did not know all the different nuances of the different cases or sophisticated legal strategy in the courtroom.  This language appears to refer to the understandable difficulty of any person's ability to know the rules of evidence and the effect of the testimony on the outcome of the trial, rather than to any unique or specific unreasonable inability of Shere.  As noted above, we find that the trial court adequately analyzed this issue and we find no error.

Shere v. State, 742 So. 2d at 221-22.  These findings are neither contrary to, nor an

unreasonable application of, clearly established United States Supreme Court law.

Further, those findings are not unreasonable in light of the facts elicited at the state

court proceedings.

Ground seventeen warrants no relief.

---

[15] This citation identifies the trial court's order denying Shere's Rule 3.850 motion for post-conviction relief. (Exhibit G-15)

Ground Eighteen

THE TRIAL COURT ERRED IN ITS USE OF THE FLORIDA DEATH
PENALTY STATUTES WHICH VIOLATE MR. SHERE'S RIGHTS UNDER
THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS, IN THAT THE
STATUTORY AGGRAVATING AND MITIGATING CIRCUMSTANCES, AS
APPLIED, DO NOT ADEQUATELY LIMIT THE CLASS OF PERSONS
ELIGIBLE FOR THE DEATH PENALTY AND THUS RENDER THE DEATH
PENALTY SUSCEPTIBLE TO UNDUE ARBITRARY AND CAPRICIOUS
APPLICATION.

Shere raised ground eighteen on direct appeal from his conviction and death

sentence.  Attacking the constitutionality of Florida's death penalty statute, Shere

advances a spate of arguments each considered and rejected in the decisional

continuum since Profitt v. Florida, 428 U.S. 242 (1976).  See, e.g., Spinkellink v.

Wainwright, 578 F.2d 582 (5th Cir. 1978); Spaziano v. Florida, 468 U.S. 447 (1984);

Hildwin v. Florida, 490 U.S. 638 (1989).

Accordingly, the Florida Supreme Court denied Shere's claim during his direct

appeal:

Shere raises two claims in the penalty phase.  First, he argues that the
Florida death penalty statute is unconstitutional because the statutory
aggravating and mitigating circumstances, as applied, do not adequately
limit the class of persons eligible for the death penalty and thus render the
death penalty susceptible to undue arbitrary and capricious application.
This claim has been rejected previously, see, e.g., Proffitt v. Florida, 428
U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); Smalley v. State, 546
So. 2d 720 (Fla. 1989); Rogers v. State, 511 So. 2d 526 (Fla. 1987), cert.
denied, 484 U.S. 1020, 108 S. Ct. 733, 98 L. Ed. 2d 681 (1988), and merits
no further discussion.

Shere v. State, 579 So. 2d at 95.  These findings are neither contrary to, nor an

unreasonable application of, clearly established United States Supreme Court law.

Likewise, that result is not unreasonable in light of the facts.  Because the Florida

Supreme Court followed the precedent of the United States Supreme Court, no basis for

relief exists.  (Of course, any new law announced in this case that "overrules" or

circumvents <u>Proffitt</u> would apply only prospectively and would afford no relief to Shere.

<u>Teague v. Lane</u>, 489 U.S. 288 (1989)).

In any event, Shere's assertion that this claim was raised in his Rule 3.850 motion

is not entirely correct.  The claim that was before the court in that proceeding is as

follows:

As his final claim, Shere asserts that Florida's death penalty statute is
unconstitutional as applied to him based upon the credible and material
factual evidence presented throughout the judicial proceedings and
because of the aggravators that were improperly applied to him.  He claims
that at most the evidence reflected that Shere was an accessory, an
unwilling and threatened participant.  This claim is procedurally barred and,
in the alternative, without merit.  Shere has already litigated the sufficiency
of the evidence presented at trial and has had that decision reviewed by
this Court.  <u>See</u> <u>Shere</u>.  Moreover, Shere is also barred because he did not
raise this claim in his 3.850 motion.  <u>See</u> <u>Doyle</u>, 526 So. 2d at 911.  To the
extent that Shere argues that the death penalty is cruel and unusual
punishment, that claim is controlled by <u>Jones v. State</u>, 701 So. 2d 76 (Fla.
1997), <u>cert</u>. <u>denied</u>, 523 U.S. 1014, 140 L. Ed. 2d 335, 118 S. Ct. 1297
(1998), and is without merit.

<u>Shere v. State</u>, 742 So. 2d at 218.  Even if presented in the present petition, Shere's

claims are procedurally barred under state law and, consequently, procedurally

defaulted for habeas purposes.  Regardless, the petition presents no basis for relief.

Ground eighteen warrants no relief.

Ground Nineteen

THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO
THE U.S. CONSTITUTION AND CORRESPONDING PROVISIONS OF
THE FLORIDA CONSTITUTION WAS VIOLATED DURING [THE]
PENALTY PHASE WHEN THE DEFENDANT WAS SHACKLED IN VIEW
OF THE JURY.

Until he testified, Shere was shackled during the penalty phase.  When Shere's

trial attorney objected to the shackling, the trial court responded:

This man is in custody.  The jury knows he's in jail. It would be foolish to
even suggest he be in the courtroom convicted of first degree murder and
not in shackles.  I mean, I don't see any prejudice in it whatsoever.

Shere alleges that shackling is inherently prejudicial and entirely unconstitutional.

In his reply, Shere relies on Deck v. Missouri, 544 U.S. 622 (2005) (prohibiting routine

and visible restraint during the penalty phase of a capital proceeding).  However, Deck

does not apply retroactively to Shere.  See Marquard v. Sec'y for the Dep't of Corr., 429

F.3d 1278, 1310-12 (11th Cir. 2005) (citing See Turner v. Crosby, 339 F.3d 1247,

1282-83 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004); Teague v. Lane, 489 U.S.

288, 310-13 (1989)).

Furthermore, the respondent alleges that Shere failed to raise ground nineteen in

state court and that the claim is procedurally barred.  Shere failed to reply to this

allegation.  An independent review of the record reveals no instance of Shere's raising

the claim in state court.

Ground nineteen warrants no relief.

## FINAL COMMENTS

Shere has not shown cause and prejudice to overcome any of the procedural defaults identified by the respondent.  Shere has alleged no fact to show actual innocence so that a manifest injustice will occur absent an adjudication on the merits of a defaulted claim.  Shere has not shown, even assuming a constitutional error, that "the error had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  Each possible error is harmless beyond reasonable doubt. Finally, Shere has alleged no fact showing that the Florida Supreme Court's resolution of any of his claims is "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).

Accordingly, the petition for writ of habeas corpus (Doc. 50) is **DENIED**.  The Clerk shall enter a judgment against Shere and close this action.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

Shere is not entitled to a certificate of appealability.  A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability (COA).  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the

- 74 -

issues presented were adequate to deserve encouragement to proceed further" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).  Shere shows neither.

Finally, because he is not entitled to a certificate of appealability, Shere is not entitled to appeal <u>in</u> <u>forma</u> <u>pauperis</u>.

ORDERED in Tampa, Florida, on July 11, 2007.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

Counsel of Record